# IN THE SUPREME COURT OF TEXAS

══════════

No. 15-0886

══════════

SAMSON EXPLORATION, LLC (FORMERLY SAMSON LONE STAR, L.P.),
PETITIONER

v.

T.S. REED PROPERTIES, INC., ET AL., RESPONDENTS

═══════════════════════════════════════════════
ON PETITIONS FOR REVIEW FROM THE
COURT OF APPEALS FOR THE NINTH DISTRICT OF TEXAS
═══════════════════════════════════════════════

**Argued February 28, 2017**

JUSTICE GUZMAN delivered the opinion of the Court.

In this dispute involving mineral interests pooled for natural gas production, lessors and other

stakeholders allege the lessee underpaid royalties owed to them under their mineral leases and

pooling agreements.[1]  One group of stakeholders asserts claims arising from the amendment of a

pooled-unit designation that changed the unit's boundaries and withdrew a producing well from that

unit (the Unpooling Stakeholders).  Another group seeks to enforce a contractual obligation to pay

---

[1] The stakeholders are Patricia Belden; Roger Craddock and Iris Klorer Craddock, Individually and as Trustees of the Craddock Family Trust; Thomas Klorer; Valerie Klorer; Marlborough School; Simpson-Omohundro Foundation; Capital One, N.A., Trustee of the Sara Wilson Carlson Exempt Trust; Capital One, N.A., Trustee of the Mark C. Wilson Grantor Trust; Thomas Edwin Doran; Andrew Johns, Individually and as Trustee of the J.J. Johns Land Trust; Gary Cruse, as Executor of the Estate of Vivian Burch; Mary Hyde; Cornelia Clark Akin; Florence Owens Dodington; Capital One, N.A., as Trustee for the William Andrew Fletcher Trust; Patricia Gardner Deland, Individually and as Executrix of the John T. Gardner Estate; Roger Steven Holley; Sallye Jones Keith by and through her attorney-in-fact, Capital One, N.A.; Joseph A. Owens, II; T.S. Reed Properties, Inc.; Walter R. Taber, Jr.; William F. Taber; and Cecil Taber Ward.

royalties on a pooled unit that indisputably encompasses two producing wells, but one of those wells had already been included within the boundaries of another pooled unit (the Overlapping Unit Stakeholders).

The issues presented largely center on the lessee's efforts to avoid a contractual obligation to pay royalties to the Overlapping Unit Stakeholders for production from a zone shared by the two pooled units. The lessee's main contract-avoidance theory is that (1) pooling necessarily effects a cross-conveyance of title; (2) a pooled unit is not valid unless title is cross-conveyed; (3) the production zone for the disputed well was previously committed to another pooled unit; (4) title cannot be conveyed twice; and (5) as a result, the subsequently pooled unit is invalid for purposes of the agreement to pay royalties. The Overlapping Unit Stakeholders dispute that cross-conveyance of title between lessors in a pooled unit is required to form a valid unit, but argue that any such requirement is limited to pooling effected by joint or community leases. The Overlapping Unit Stakeholders further argue, in the alternative, that cross-conveyance of title is merely a theory of implied or presumed contractual intent that can be—and was in this case—expressly disclaimed. As their primary argument, however, the Overlapping Unit Stakeholders assert that ineffective conveyance of title is not a valid defense to a breach-of-contract action.

The lower courts held the agreement to pay royalties is enforceable, and we agree. Ineffective conveyance of title does not preclude the lessee's liability under a contract theory. With respect to the other issues raised in the cross-petitions for review, we hold:

- the lessee's quasi-estoppel and scrivener's error defenses to contract enforcement fail as a matter of law;

2

- the lessee is not entitled to recoup royalty payments from stakeholders in another pooled unit;

- our decision in *Hooks v. Samson Lone Star, Ltd. Partnership*[2] precludes the Unpooling Stakeholders' claims; and

- the court of appeals properly construed a proportionate-reduction clause to award royalties owed to the Overlapping Unit Stakeholders in accordance with their 50% mineral-interest ownership.

Accordingly, we affirm the court of appeals' judgment.

## I. Factual and Procedural Background

Samson Exploration, LLC (formerly Samson Lone Star, L.P.) is the lessee under adjacent East Texas mineral leases unilaterally pooled for natural gas development. The litigation over royalties owed under the mineral leases involves multiple stakeholders, three gas wells, and two pooled units. Samson was authorized to pool the leases, and the pooled units conform to the terms of the pooling provisions in the underlying leases,[3] but Samson's execution of the pooling unit designations generated a dispute about the production attributable to each pooled unit. The material facts are, for the most part, undisputed.

## A. Unpooling Claims

In mid-2001, Samson created the Black Stone Minerals A No. 1 Gas Unit (Black Stone Minerals Unit), which had boundaries of 6,000 to 13,800 feet subsurface. Samson obtained

---

[2] 457 S.W.3d 52 (Tex. 2015).

[3] Subject to an exception not applicable in this case, one of the leases authorized pooling only if the entire leased acreage was included in the pooled unit. Although only a portion of the leased premises was pooled into one of the units at issue, the parties agree and the record establishes that the lessor waived the lease requirement in writing and that the lease provision containing that limitation was thereby amended.

3

production from two wells within the pooled unit's boundaries. The first well, which produced from 12,304 feet to 12,332 feet subsurface, was located on property leased by Black Stone Minerals Co. The second well was on the Joyce DuJay lease and produced from 13,150 to 13,176 feet subsurface. After obtaining production from both wells in the unit, Samson unilaterally amended the unit's boundaries, reducing the surface acreage committed to the unit and changing the pool's depths to 12,400 feet and below. The amended unit was renamed the Joyce DuJay No. 1 Gas Unit (DuJay1/Amended Unit). Altering the pooling unit's boundaries had the effect of excluding the first well from the amended and renamed unit. Samson amended the unit in this manner because, despite a co-tenant's consent to pooling, Black Stone Minerals exercised a contractual right against pooling its mineral interests.

After amendment and renaming, Samson did not attribute any production from the first well to the DuJay1/Amended Unit. Asserting breach-of-contract claims, stakeholders in the DuJay1/Amended Unit (the Unpooling Stakeholders) contend the amendment was improper and Samson therefore owes them royalties based on production from the first well. However, in a recent case involving the same circumstances, *Hooks v. Samson Lone Star, Ltd. Partnership*, we held the unpooling claims of similarly situated stakeholders were not viable because they had ratified the amendment altering the Black Stone Minerals Unit's boundaries and renaming it the DuJay1/Amended Unit.[4] Our holding, we said, was based "solely on the facts that [the stakeholders]

---

[4] 457 S.W.3d at 65-66.

4

received [from Samson] notice of an amendment to the unit designation, accepted royalties from the amended unit, and [did] not challenge the amended unit."[5]

### B. Overlapping Units Claims

After establishing the DuJay1/Amended Unit, Samson drilled a third well, which, like the second well, was located on the Joyce DuJay lease. About ten months later, Samson retroactively designated a new unit covering the depth at which the third well was producing—12,197 to 12,342 feet. The new unit was named the Joyce DuJay A No. 1 Gas Unit (DuJay-A Unit or Overlapping Unit) and largely included the same surface area as the DuJay1/Amended Unit plus additional acreage from the T.S. Reed Properties lease (Reed lease). Though the third well produced above the DuJay1/Amended Unit's subsurface boundaries, the DuJay-A Unit's boundaries extend to "production occur[ing] below a depth of 12,000 feet," thus encompassing subsurface depths that overlap the depths in the DuJay1/Amended Unit. Under the express terms of the pooling instrument, the second well is included in both the DuJay1/Amended Unit and the later-formed DuJay-A Unit. Samson has paid royalties on the second well only to the DuJay1/Amended Unit stakeholders (Unpooling Stakeholders) and not the DuJay-A Unit stakeholders (Overlapping Unit Stakeholders). The Overlapping Unit Stakeholders contend Samson breached its obligations under the mineral lease and pooling unit designation by failing to pay royalties on production from the second well.[6]

---

[5] *Id.* at 66.

[6] The Overlapping Unit Stakeholders base their claims on the Reed lease. Those plaintiffs, which the parties refer to as the "Reed Plaintiffs," are T.S. Reed Properties and ten nonparticipating royalty-interest holders in the land subject to the Reed lease.

5

Though admitting the overlap, Samson disclaims any intent to create overlapping units, asserting the failure to designate a depth limitation to avoid any overlap was a mistake. Samson had the unilateral right to pool under the leases at issue and was the master of the unit designation describing the pooled unit. As originally drafted and as revised from time-to-time to add new leases to the unit, the pooling instrument specified a lower depth limitation of 12,400 feet. Shortly before the unit designation was filed, however, Samson's outside counsel revised the instrument to remove the depth limitation and affirmatively changed the unitized depth to production "below a depth of 12,000 feet." Before filing the designation with the county, Samson circulated it internally with the following handwritten notation on the routing memo: "Re-routed 7-2-03 / 12,000' & below."

In connection with this lawsuit, counsel could not recall—some ten years after the unit designation was filed with the county—"why the change was requested," but denied any "intent to create a unit that overlapped with the same depths as the [DuJay1/Amended] Unit." He explained:

> Given that the [DuJay1/Amended] Unit included some of the same surface acreage as the [DuJay-A] Unit, it would have been a mistake to include depths in the [DuJay-A] Unit that were already included in the [DuJay1/Amended] Unit. It was a scrivener's error for the unit designation of the [DuJay-A] Unit not to have stated a depth limitation of 12,400 [feet].

Though the unit designation allows for amendment "at any time, in order to correct any error herein," the record reflects that Samson did not amend the unit to correct the alleged error.

Samson contends the DuJay-A Unit pooling is invalid due to the overlap with the DuJay1/Amended Unit. In the alternative, Samson asserts (1) enforcement should be denied based on the Overlapping Unit Stakeholders' acceptance of payments limited to production on the third well or (2) the pooling designation should be reformed to specify a bottom depth limitation of 12,400

6

feet due to a scrivener's error. If Samson is held to its agreement, Samson argues the DuJay1/Amended Unit stakeholders must forfeit, at least in part, payments for production from the second well, because imposing liability under the pooling agreement with the DuJay-A Unit stakeholders would have the practical effect of enlarging the DuJay1/Amended Unit and decreasing each stakeholder's net mineral interest in the larger pooled unit. Samson contends its working interest should not bear the burden of the royalty obligation.

## C. Lower Court Proceedings

Some of the Unpooling Stakeholders sued Samson in 2004, and thereafter other Unpooling Stakeholders joined the suit along with the Overlapping Unit Stakeholders. Over the span of five years, the trial court rendered judgment on the parties' claims, counterclaims, and defenses in a series of interlocutory summary-judgment orders. In 2013, the trial court rendered final judgment, awarding nearly $450,000 in breach-of-contract damages to the Unpooling Stakeholders and more than $2.5 million in breach-of-contract damages to the Overlapping Unit Stakeholders.[7] The latter award reflects a reduction in accordance with the Reed lease's proportionate-reduction clause, which was applied based on the Overlapping Unit Stakeholders' 50% mineral interest. The trial court also awarded pre-judgment interest in excess of $1.5 million and post-judgment interest at statutory and contractually specified rates.

The parties cross-appealed, asserting various complaints about the trial court's summary judgment, a good number of which are not at issue on appeal to this Court. The court of appeals

_____

[7] The trial court awarded additional damages to some of the plaintiffs on claims for accrued, but unpaid royalties. That portion of the judgment was not appealed.

reversed the judgment favoring the Unpooling Stakeholders and rendered judgment for Samson based on our ratification holding in *Hooks*.[8]  With regard to the Overlapping Unit Stakeholders, the court of appeals affirmed as to liability without reimbursement from the DuJay1/Amended Unit stakeholders[9] and affirmed the proportionate-reduction clause's application,[10] but concluded the damages award was excessive to the extent it was calculated based on production that had occurred before the Overlapping Unit existed.[11]  The court reversed the damages award on that basis and remanded to the trial court on the damages issue.  The court affirmed the judgment as to all non-appealing parties.

No party was completely satisfied with the court of appeals' judgment, and consequently, each side petitioned for review.

## II. Discussion

In this appeal, the issues have narrowed somewhat, though several issues are presented. Samson challenges the judgment in the Overlapping Unit Stakeholders' favor on the grounds of contract invalidity and the affirmative defenses of quasi-estoppel and reformation based on scrivener's error, complaining the court of appeals ignored its cross-conveyance-of-title argument and failed to consider evidence raising a fact issue on its affirmative defenses.  Samson also claims

---

[8] 2015 WL 6295726, at *6, ___ S.W.3d ___ (Tex. App.—Beaumont 2015) (finding "no significant distinction between the acts of the stakeholders in the [DuJay1/Amended] Unit that are at issue here and the acts the Supreme Court relied on in *Hooks* to conclude that by such acts, Samson's amendment was ratified and had been accepted").

[9] *See generally id.* at *7-17.

[10] *Id.* at *22-23.

[11] *Id.* at *20-21.

8

a right of reimbursement against stakeholders in the DuJay1/Amended Unit to the extent Samson is liable to the Overlapping Unit Stakeholders, describing its royalty payments to the former as good-faith overpayments.

The Unpooling Stakeholders urge error in the court of appeals' reliance on *Hooks* on both procedural and evidentiary bases, arguing (1) Samson failed to properly raise the ratification defense in the trial court, and (2) in the alternative, three of the Unpooling Stakeholders—Marlborough School, Simpson-Omohundro Foundation, and the estate of Vivian Burch—did not receive the same notice regarding amendment of the Black Stone Minerals Unit that we identified in *Hooks* as sufficient to support ratification. The Overlapping Unit Stakeholders contend the lower courts misconstrued the Reed lease and misapplied the proportionate-reduction clause, asserting the proportionate-reduction clause is not implicated because the lease conveyed only a 50% mineral interest.

The foregoing issues were resolved on cross-motions for summary judgment. Accordingly, we apply well established standards of review, requiring rendition of judgment as a matter of law absent a genuine issue of material fact.[12] We review summary-judgment evidence "in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence

---

[12] *See* TEX. R. CIV. P. 166a(c), (i); *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2016) ("To defeat a no-evidence motion, the non-movant must produce evidence raising a genuine issue of material fact as to the challenged elements."); *SeaBright Ins. Co. v. Lopez*, 465 S.W.3d 637, 641 (Tex. 2015) (in a traditional motion for summary judgment, the movant must prove no material fact issue exists and it is therefore entitled to judgment as a matter of law).

9

favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not."[13]

## A. Breach of Contract as a Viable Theory of Recovery

"[O]il and gas leases in general, and pooling clauses in particular, are a matter of contract."[14] A lessee's authority to pool requires the lessor's consent, which is typically furnished via a pooling provision in the mineral lease.[15] Pooling is valid only if done "in accordance with the method and purposes specified in the lease."[16] A pooled unit that does not comply with the terms of the pooling agreement is invalid and unenforceable absent the lessor's ratification.[17] "The primary legal consequence of pooling is that production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit."[18] We have further said that pooling "'effects a cross-conveyance among the owners of minerals under the various tracts of royalty or minerals in a pool so that they all own undivided interests under the unitized tract,'"[19] but at the same

[13] *SeaBright Ins.*, 465 S.W.3d at 641 (quoting *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009)).

[14] *Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 424 (Tex. 2008).

[15] *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 170 (Tex. 1999).

[16] *Id.*

[17] *Cf. Montgomery v. Rittersbacher*, 424 S.W.2d 210, 213-15 (Tex. 1968) (though executive-rights holder has the exclusive right to lease, that right does not extend to pooling a nonparticipating royalty interest (NPRI) because pooling has the effect of diminishing the NPRI's interest; however, the NPRI can ratify a pooling agreement and take a proportional share even if the executive exceeded its authority in the first instance).

[18] *Tichacek*, 997 S.W.2d at 170.

[19] *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 62-63 (Tex. 2015) (quoting *Montgomery*, 424 S.W.2d at 213); *see also Minchen v. Fields*, 345 S.W.2d 282, 285 (Tex. 1961) ("'[A] unitization of the royalty and minerals under different tracts effects a cross-conveyance to the owners of minerals under the various tracts of royalty or minerals so that they all own undivided interests under the unitized tract in the proportion their contribution bears to

time we have never determined "whether pooled units may overlap."[20] Leases may be validly pooled even when all royalty interests in the land are not pooled; for example, absent consent, the right of the executive to lease does not extend to pooling a nonparticipating royalty interest (NPRI), and failing such consent or subsequent ratification, an NPRI must be paid on a nonpooled basis while pooled interests share pro rata.[21] Thus a lessee may owe different royalty obligations with respect to the same lands.

In this case, the parties agree Samson had authority to create the DuJay-A (Overlapping) Unit and the unit conforms to the lease requirements for pooling. Samson nevertheless asserts it has no obligation to pay royalties as promised because the DuJay-A Unit shares a zone with a previously pooled unit. Though governed by contract, pooling involves property rights. Samson's contract-invalidity argument centers on the contention that "it is impossible to cross-convey the same pooled lands, substances, and depths twice at the same time." Samson thus contends the DuJay-A pooling was invalid due to the overlap.

The court of appeals construed Samson's somewhat vague defensive theory as a claim of impracticability.[22] Supervening impracticability excuses contract performance when, "after a

---

the unitized tract.'" (citing *Veal v. Thomason*, 159 S.W.2d 472 (Tex. 1942) and quoting lower court opinion with approval)).

[20] *Hooks*, 457 S.W.3d at 66.

[21] *Minchen*, 345 S.W.2d at 284-85; *see also Montgomery*, 424 S.W.2d at 213-14; *cf. Brown v. Smith*, 174 S.W.2d 43, 46 (Tex. 1943) (lease could not be enforced against lessee because lease was executed pursuant to a contract that required all royalty interest holders to join the lease, NPRI holder did not join the lease, and executive did not have the right to pool the NPRI; consequently, "the lease tendered was . . . not the lease that petitioners contracted to acquire").

[22] 2015 WL 6295726, at *10-13, ___ S.W.3d ___ (Tex. App.—Beaumont 2015).

11

contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary."[23] Samson does not challenge the court of appeals' holding that, as a matter of law, Samson was not without fault in frustrating performance. As the court of appeals explained, Samson unilaterally created the pooled unit and unilaterally defined its boundaries, without including a depth limitation.[24] The court of appeals declined to consider whether a cross-conveyance of title is required to effect a pooling or under what circumstances, because the case "was not tried as a trespass to try title case; instead, the trial court awarded contract damages under the DuJay-A claimants' breach of contract theory."[25]

Asserting the court of appeals missed the point, Samson characterizes the matter as "akin to a defense of illegality," asserting the law does not authorize overlapping pooled units and that enforcement should therefore be limited to "[the unit's] permissible boundaries—from 12,000 feet to 12,400 feet subsurface."[26] Arguing a contractual obligation to pay royalties on the second well

---

[23] RESTATEMENT (SECOND) OF CONTRACTS § 261 (1981); *see also Centex Corp. v. Dalton*, 840 S.W.2d 952, 954 (Tex. 1992) (holding a contract unenforceable when rendered invalid by governmental regulations).

[24] 2015 WL 6295726, at *11-12 (holding the record conclusively establishes that "Samson and its agents were the only decision makers with respect to creating the boundaries of the pools at issue" and no evidence exists that "any of the DuJay-A claimants were involved in the decisions Samson made to establish the boundaries of the pools at issue [or that they] were on notice of the unit's boundaries before Samson filed the document that declared them").

[25] *Id.* at *11.

[26] Samson implies that, as with an illegal contract (which this is not), severance could remedy the alleged infirmity, but Samson does not identify what language could be severed to rectify the alleged invalidity and none is apparent. The only way to rectify any infirmity in the pooling designation is to add language. "While Texas courts favor validating transactions rather than voiding them, a court may not create a contract where none exists and generally may not add, alter, or eliminate essential terms." *MKM Eng'rs, Inc. v. Guzder*, 476 S.W.3d 770, 778 (Tex. App.—Houston

12

cannot be enforced unless the unit designation was capable of effecting a cross-conveyance of title of the related subsurface depths, Samson says the court of appeals should have considered whether a cross-conveyance of title is effected rather than enforcing payment of a royalty under the leases as a contract.

The Overlapping Unit Stakeholders view the cross-conveyance of title theory as a red herring because this is a contract dispute, not a title dispute. The stakeholders further assert that the cross-conveyance of title theory arises only in the context of joint and community leases[27] and argue the theory—one of presumed contractual intent[28]—is not implicated when pooled units are unilaterally formed by lessees pursuant to a mineral-lease pooling provision. The stakeholders

---

[14th Dist.] 2015, no pet.).

[27] *See, e.g.*, *Veal v. Thomason*, 159 S.W.2d 472, 476-77 (Tex. 1942) (for purposes of determining "necessary parties" to a trespass-to-try-title action, community lease vested "all the lessors of land in [a] unitized block with joint ownership of the royalty earned from all the land" in the unit, which "constitute[d] the owner of such royalty the owner of an estate in such land"); *French v. George*, 159 S.W.2d 566, 568-69 (Tex. Civ. App.—Amarillo 1942, writ ref'd) (terms of jointly executed lease could only be construed as intending to effect a pooling with proportional sharing of royalties). *Compare Sohio Petrol. Co. v. Jurek*, 248 S.W.2d 294, 298 (Tex. Civ. App.—Fort Worth 1952, writ ref'd n.r.e.) (rejecting cross-conveyance theory applied to pooling effected by means other than the community and joint leasing scenarios in *Veal*, *French*, and *Belt v. Tex. Co.*, 175 S.W.2d 622 (Tex. Civ. App.—Amarillo 1943, writ ref'd)) *with Miles v. Amerada Petrol. Corp.*, 241 S.W.2d 822, 825-26 (Tex. Civ. App.—El Paso 1950, writ ref'd n.r.e.) (observing that, like a joint lease, a lease with a pooling provision works as a cross-conveyance of title, but ultimately concluding the pooling provision in that case was void under the guardianship statute).

[28] *See Veal*, 159 S.W.2d at 476 ("To our minds, when we look to the substance and intent of this [unitized mineral] lease contract considered as a whole, the above-recited provisions can have no effect other than to constitute all the lessors of land in the unitized block joint owners, or joint tenants, of all royalties reserved in each of the several leases in such block, the ownership being in the proportion which the acreage of each lease contract bears to the total acreage of the unitized block."); 2 BRUCE M. KRAMER AND PATRICK H. MARTIN, THE LAW OF POOLING AND UNITIZATION § 19.02[2][d] (3d ed. 2016) (characterizing the *Veal* doctrine as essentially presuming an intent to convey from the language of an instrument that does not contain express grant orders and observing that "community leases, pooling clauses, and pooling and unitization agreements create a presumed intent to cross-convey").

13

assert, moreover, that cross-conveyance of title can be expressly disclaimed[29] and, as a result, pooling does not require a cross-conveyance between lessors.[30]

In Texas, the cross-conveyancing theory originated as a theory of contractual intent in the context of joint or community leases.[31] Though we have never expressly considered whether cross-conveyance of title may be contractually disclaimed, we have observed that mineral owners may "protect[] their estates by express stipulation."[32] Under the law in Texas, pooling implicates both contract and property law—authority to pool emanates from contract but pooling agreements give rise to interests in realty.[33] The cross-conveyance theory of title can be critical, even "outcome

---

[29] *See HS Res., Inc. v. Wingate*, 327 F.3d 432, 439 n.13 (5th Cir. 2003) (rejecting argument that the cross-conveyance doctrine required joinder of other lessors in pooled unit for several reasons, including that lease language disclaimed a cross-conveyance of interests).

[30] *See, e.g.*, *Puckett v. First City Nat'l Bank of Midland*, 702 S.W.2d 232, 236-37 (Tex. App.—Eastland 1985, writ ref'd n.r.e.) (rejecting argument that royalty owner should be paid royalties from a "split stream" sale of gas from a voluntarily pooled unit using a weighted average method because the lease language expressed an intent "not to effect a cross conveyance as to payments of royalty").

[31] *See, e.g.*, *Southland Royalty Co. v. Humble Oil & Ref. Co.*, 249 S.W.2d 914, 916 (Tex. 1952); *Veal*, 159 S.W.2d at 476; *French*, 159 S.W.2d at 568-69.

[32] *Southland Royalty*, 249 S.W.2d at 917 ("We know of nothing in our holding to prevent reversionary owners . . . from protecting their estates by express stipulation."); *see also Wagner & Brown, Ltd. v. Shepphard*, 282 S.W.3d 419, 424 (Tex. 2008) ("Just as owners and operators generally must agree to create a pool, they should also be able to agree when one terminates. If the parties want pooling to expire (or not) upon termination of one lease, they should be free to say so."); 2 BRUCE M. KRAMER & PATRICK H. MARTIN, THE LAW OF POOLING AND UNITIZATION § 19.01[1] (3d ed. 2016) ("The emphasis on the intent of the parties suggests that when the parties expressly state their preference, the courts will follow that language and not resort to the [judicially implied] choice made . . . when the parties have left the issue undecided.").

[33] *See, e.g.*, *Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 371 (Tex. 2001) (oil and gas leases are an interest in real property); *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 571 (Tex. 1981) ("The rights and duties of the lessor and lessee are determined by the lease and are contractual. The lease constitutes the contract."); *Renwar Oil Corp. v. Lancaster*, 276 S.W.2d 774, 776 (Tex. 1955) (although "an oil and gas lease is a contract in the sense that it is a conveyance of realty upon terms and conditions which may be contractual in nature," for purposes of the venue statute, the relief sought in the case concerned a dispute about real-property interests); *Brown v. Smith*, 174 S.W.2d 43, 46 (Tex. 1943) ("The joint ownership of the royalty interest in all of the land included in such lease is created by the action of the several land owners in joining in the execution of the lease."); *Williamson v. Mobil Producing Tex. & N.M. Inc.*, 737 S.W.2d 917, 921 (Tex. App.—Beaumont 1987, writ denied) (withholding of royalty payments under mineral lease and

14

determinative" as to some issues,[34] such as venue,[35] but Samson's argument in this case is a theoretical construct that holds no water. Considering the pertinent authority, we discern no impediment to enforcing Samson's obligations in this case under a contract theory even if the pooling designation failed to effect a conveyance of title.[36] The other issues the parties raise are interesting, but ultimately immaterial to the narrow issue presented.

## B. Quasi-Estoppel and Scrivener's Error

Samson asserts two other defenses to contract enforcement: quasi-estoppel and scrivener's error. "Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken."[37] "The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he

---

pooling agreement gave rise to a breach-of-contract action).

[34] 2 BRUCE M. KRAMER & PATRICK H. MARTIN, THE LAW OF POOLING AND UNITIZATION § 19.01[1], [2][b][ii] (3d ed. 2016) (the nature of unitized title as effecting a cross-conveyance of title "do[es] not exist in the abstract but in the context of the following issues: who may effect a pooling of interests; who will be indispensable parties to litigation regarding the pooled unit; and what is the appropriate venue for litigation"; other matters determined by that issue include whether unitization is binding on assignees, the descendability or inheritability of pooled interests, and the statute of frauds, among others).

[35] *See Yzaguirre*, 53 S.W.3d at 371 (though oil and gas leases are an interest in real property, applicable venue statute applied only when ownership of property was in dispute; the real-property venue statute did not apply here because the dispute's substance was about obligations owed to royalty owners under the terms of the leases concerning valuation, not the boundaries of the leases or the percentage of royalties); *Renwar Oil*, 276 S.W.2d at 775-76 (in determining proper venue, the Court determined the suit's substance involved adjudication of title because the litigation required adjudication of potentially competing mineral interests to ascertain the plaintiff's entitlement to the claimed royalty).

[36] *Cf.* TEX. PROP. CODE § 5.002 ("An instrument intended as a conveyance of real property or an interest in real property that, because of this chapter, fails as a conveyance in whole or in part is enforceable to the extent permitted by law as a contract to convey the property or interest."); *Hoover v. Wukasch*, 254 S.W.2d 507, 507-09 (Tex. 1953) (written five-year lease not a valid conveyance of premises but nevertheless enforceable as a contract to lease).

[37] *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000).

15

acquiesced, or from which he accepted a benefit."[38]  Samson cites evidence in the record that (1) following a request by Samson, the president of T.S. Reed Properties consented to amending the lease to allow pooling of less than the entire lease acreage "to form the Unit for the Joyce DuJay 'A' No.1 Unit *Well*" (singular; emphasis added); (2) before finalizing the unit designation that eliminated the DuJay-A Unit's lower-depth limitation to include the second well, Samson informed one of the parties (accurately at the time) that the pooled interest did not extend to the second well; and (3) the Overlapping Unit Stakeholders accepted royalty payments for years and signed division orders that were based only on the third well and that made no reference to the second well.  Considering the first and second events occurred long before the revised pooling unit designation was altered and finalized without a depth limitation, these circumstances are no evidence of inconsistency.  As to the third, accepting an underpayment is not inconsistent with claiming an entitlement to more.  Nor is there anything in the division orders or accompanying the royalty payments that would suggest the Overlapping Unit Stakeholders were accepting the royalty payments on the third well in lieu of royalty payments on both the second and the third.  Accordingly, the evidence Samson cites does not raise a material fact issue regarding estoppel.

A "scrivener's failure to embody the true agreement of the parties in a written instrument" provides grounds for the equitable remedy of "reformation on the basis of mutual mistake."[39] Mutual

---

[38] *Id.*

[39] *Gail v. Berry*, 343 S.W.3d 520, 524 (Tex. App.—Eastland 2011, pet. denied); *see also Thalman v. Martin*, 635 S.W.2d 411, 413 (Tex. 1982) (parties "are entitled to the equitable remedy of reformation of their deed upon proving (1) they had reached an agreement . . . but (2) the [document] did not reflect the true agreement because of a mutual mistake").

16

mistake, which is the key to establishing a scrivener's error, requires evidence showing both parties were acting under the same misunderstanding regarding the same material fact.[40] The record in this case bears no such evidence. Despite evidence that elimination of a depth limitation was requested as an affirmative alteration and that Samson had notice of the change at the time the designation was filed with the county, it is probable, and perhaps likely, that altering the depth limitation in the pooled-unit designation was a mistake. The record, however, betrays no hint of mutual misunderstanding. The evidence establishes that Samson alone was responsible for delineating the pooled unit's boundaries and drafting and filing the pooled-unit designation. The record bears no evidence that the Overlapping Unit Stakeholders played any role in any of these matters. We therefore agree with the court of appeals that Samson's affirmative defenses fail as a matter of law.[41]

## C. Disgorgement of Royalty Payments

Rather than paying royalties owed to the Overlapping Unit Stakeholders out of its working interest, Samson claims a right of reimbursement from stakeholders in the DuJay1/Amended Unit to the extent of any royalty obligation to the Overlapping Unit Stakeholders. Samson's reimbursement theory rests on the premise that enforcing its obligation to pay "has the practical effect of enlarging the [DuJay1/Amended] unit." Reframing its contractual obligation in this way, Samson contends pro-rata sharing in the enlarged pooled unit requires recalculation of the royalties

---

[40] *See Smith-Gilbard v. Perry*, 332 S.W.3d 709, 713 (Tex. App.—Dallas 2011, no pet.).

[41] In light of this disposition, we need not address the Overlapping Unit Stakeholders' alternative argument that Samson's quest for reformation is untimely whether asserted as a claim or as a defensive remedy based on a scrivener's error. *See Cosgrove v. Cade*, 468 S.W.3d 32, 34-35 (Tex. 2016) (holding reformation claim based on "[p]lainly obvious and material omissions in an unambiguous deed" was barred after four years because such defects "charge parties with irrebuttable notice for limitations purposes").

owed to all those entitled to payment on production from the second well. Characterizing prior royalty payments to the DuJay1/Amended Unit stakeholders as "good faith overpayments," Samson asserts the court of appeals erred in barring recovery based on the voluntary-payment rule.

"'[M]oney voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud, deception, duress, or compulsion, cannot be recovered back merely because the party at the time of payment was ignorant of or mistook the law as to his liability.'"[42] The court of appeals concluded "the summary judgment evidence conclusively shows that Samson's payments [to the DuJay1/Amended Unit stakeholders] were voluntary and that Samson made the payments . . . with full knowledge of the fact that it had created units that shared significant areas of their pools, including the zone being produced by one of its wells."[43] The court also observed that Samson "never exercised its authority to amend the designation of the declaration, even though the designation that it filed expressly provided that Samson reserved the right to do so 'in order to correct any error herein[.]'"[44] Further, "Samson did not allege that any of the [DuJay1/Amended Unit] claimants were guilty of any acts of fraud, that it paid the royalties under duress, or that it was compelled to pay royalties over its objection to doing so."[45] We concur in the court of appeals' assessment of the record.

---

[42] *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 768 (Tex. 2005) (alterations in original) (quoting *Pennell v. United Ins. Co.*, 243 S.W.2d 572, 576 (Tex. 1951)).

[43] 2015 WL 6295726, at *17, ___ S.W.3d ___ (Tex. App.—Beaumont 2015).

[44] *Id.* (alteration in original).

[45] *Id.*

Samson did not attempt to correct the alleged error in the DuJay-A Unit pooling designation, though it had ample opportunity to do so. Samson, however, argues it paid royalties under duress and was prevented from rectifying the DuJay-A Unit's boundary error because, under the 2012 court of appeals' opinion in *Samson Lone Star, Ltd. Partnership v. Hooks*,[46] such an alteration might have constituted a breach of contract. In *Samson Lone Star*, the court stated:

> Samson's redesignation of the [Black Stone Minerals] unit [would] constitute[] a breach of [certain leases] by Samson, as [would] its failure to pay the [lessees] royalties on the production from the [Black Stone Minerals] well unless the lessors agreed to the unpooling [but] by accepting royalty checks from the amended and redesignated pooling units, the [DuJay1/Amended] and DuJay A-1 units, which they had been notified replaced the [Black Stone Minerals] unit, and by not asserting any rights to royalties from the original [Black Stone Minerals] unit or making any timely claim against Samson in regard to the amendment and redesignation of [that] unit the [lessees] accepted and ratified the amendment and redesignation of the units.[47]

Even if the suggestion of breach in *Samson Lone Star* were not dicta, as it appears to be, Samson's claim of duress is unavailing. Nearly nine years elapsed between the time Samson filed the designation and the time the opinion in *Samson Lone Star* was issued. During most of that time period, Samson was on notice that allocation of production in the DuJay1/Amended and DuJay-A units was at issue. Samson had actual notice that the depths between the two units overlapped, regardless of whether anyone had complained to Samson about that circumstance. Samson identifies no circumstances in the many years before *Samson Lone Star* came out suggesting royalties were paid to the DuJay1/Amended stakeholders under duress and no impediment to rectifying the

---

[46] 389 S.W.3d 409 (Tex. App.—Houston [1st Dist.] 2012), *aff'd in part, rev'd in part* 457 S.W.3d 52 (Tex. 2015).

[47] *Id*. at 433-34.

19

omission of a lower-depth limitation, which its own witnesses testified was an obvious error, during that time period.

We therefore hold Samson must bear its contractual obligation to pay royalties out of its working interest rather than seeking reimbursement from stakeholders in the DuJay1/Amended Unit. Though Samson bemoans the economic consequences of its actions, this is a circumstance of Samson's own making:

> [The lessee,] unfortunately, has agreed to pay royalties two ways. Our conscience, though aroused, is relieved by the recognition that [the lessee] was the scrivener, and lucidity was in its hands and with its pen. While it may be unusual to have double royalty agreements, contract conformity to the usual is not a judicial responsibility. To argue that we must enforce only reasonable contracts or contracts which reasonable men enter into, mistakes our function. We can and do enforce unreasonable contracts if they be clear. Unreasonable men make reasonable contracts and reasonable men may make unreasonable contracts.[48]

### D. Ratification

The court of appeals held Samson conclusively established the Unpooling Stakeholders ratified the DuJay1/Amended Unit and therefore reversed and rendered judgment in Samson's favor on the unpooling claims.[49] The court rejected the stakeholders' argument that Samson waived the defense in the trial court by not presenting evidence of ratification in response to the stakeholders' traditional motion for partial summary judgment on liability.[50] Finding the matter preserved for appellate review, the court further determined "no significant distinction" existed between the record

---

[48] *Howell v. Union Producing Co.*, 392 F.2d 95, 115 (5th Cir. 1968).

[49] 2015 WL 6295726, at *6, ___ S.W.3d ___.

[50] *Id.* at *5-6.

in this case and the acts we relied on in *Hooks v. Samson Lone Star, L.P.* to conclude the DuJay1/Amended Unit had been ratified and accepted.[51] By cross-petition for review, the Unpooling Stakeholders assert error on both counts.

With regard to the preservation matter, the record shows Samson asserted ratification as an affirmative defense in its answer, asserted ratification as a liability bar in the conclusion and prayer of its response to the stakeholders' motion for summary judgment, and moved for summary judgment with supporting evidence after the trial court granted the Unpooling Stakeholders' motion but before rendition of final judgment. The stakeholders nevertheless assert Samson waived the defense by failing to bring forth supporting evidence in response to their motion for summary judgment. In the alternative, they assert that, based on the record in this case, *Hooks* does not support ratification of the DuJay1/Amended Unit as to three of the Unpooling Stakeholders—the Simpson-Omohundro Foundation, the Marlborough School (successor to Nancy Omohundro Long), and Vivian Burch (via executor, Gary Cruse)—because those parties did not receive the same notification regarding amendment of the Black Stone Minerals Unit that we found sufficient to sustain the ratification defense in *Hooks*. We address these matters in turn.

### 1. Preservation

In 2008, the trial court granted the Unpooling Stakeholders' motion for partial summary judgment on the unpooling claims, ordering Samson was liable for royalties on the first well as if the pool had not been amended, but leaving undetermined the amount of damages. In 2013, Samson submitted a motion for reconsideration of the interlocutory partial summary-judgment order,

---

[51] *Id.* (citing *Hooks v. Samson Lone Star, L.P.*, 457 S.W.3d 52, 65-66 (Tex. 2015)).

21

incorporating by reference a contemporaneously filed cross-motion for partial summary judgment asserting ratification and other affirmative defenses. The Unpooling Stakeholders argued Samson's motion was an untimely response to their motion for partial summary judgment because Samson was "required to raise all alleged defenses when [the Unpooling Stakeholders] originally filed their motions for summary judgment."

The trial court referred both the motion for reconsideration and the motion for summary judgment to a special master for a hearing. Following a hearing, the parties filed post-submission briefing and correspondence on the merits, and the special master allowed the parties to file objections to his tentative rulings. Based on the special master's recommendation, the trial court expressly denied both motions.

The court of appeals concluded Samson did not waive its ratification defense:

> Because the trial court's 2008 order was interlocutory, and because Samson secured a ruling on its affirmative defense of ratification [before final judgment], the record shows that Samson presented its complaint to the trial court in a timely motion and that the court ruled on its request.[52]

The Unpooling Stakeholders assert the court of appeals erred in relying on the general rules of preservation in Texas Rule of Appellate Procedure 33.1 without considering the more specific presentment requirements in Texas Rule of Civil Procedure 166a governing summary-judgment motions.

Generally, to preserve a complaint for appellate review: (1) a party must complain to the trial court by a timely and specific request, objection, or motion that complies with applicable evidentiary,

---

[52] *Id.* at *5 (citing TEX. R. APP. P. 33.1).

22

procedural, and appellate rules; and (2) the trial court must rule or refuse to rule on the request, objection, or motion.[53]  At issue is Samson's compliance with Rule 166a(c), which applies to traditional motions for summary judgment and provides in pertinent part:

> The motion for summary judgment shall state the specific grounds therefor. . . . Except on leave of court, the adverse party, not later than seven days prior to the day of hearing may file and serve opposing affidavits or other written response. . . . *Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal.*[54]

Based on the emphasized language, the Unpooling Stakeholders assert Samson waived ratification as an affirmative defense to liability by failing to "expressly present[]" the issue in its response to the motion for partial summary judgment.  The stakeholders rely on both *Kelley-Coppedge, Inc. v. Highlands Insurance Co.*, in which we held a summary-judgment nonmovant waived an insurance-policy exclusion because the nonmovant "asserted its applicability for the first time in its motion for new trial,"[55] and *City of Houston v. Clear Creek Basin Authority*, in which we held that:

> The non-movant must expressly present to the trial court any reasons seeking to *avoid* movant's entitlement, such as those set out in rules 93 and 94, and *he must present summary judgment proof when necessary to establish a fact issue*. . . .  No longer must the movant negate all possible issues of law and fact that *could* be raised by the non-movant in the trial court but were not. . . .  [T]he non-movant must now, in a written answer or response to the motion, expressly present to the trial court

---

[53] TEX. R. APP. P. 33.1.

[54] TEX. R. CIV. P. 166a(c) (emphasis added).

[55] 980 S.W.2d 462, 467 (Tex. 1998).

those issues that would defeat the movant's right to a summary judgment and failing to do so, may not later assign them as error on appeal.[56]

Neither case resolves the matter presented for several reasons. Here, Samson did not wait until after final judgment to assert the applicability of its affirmative defense "for the first time." Rather, Samson pleaded ratification as an affirmative defense in compliance with Texas Rule of Civil Procedure 94, raised it again in response to the motion for partial summary judgment on liability, and moved for summary judgment on its affirmative defense prior to final judgment.[57] *Kelley-Coppedge* is therefore inapplicable.[58] With regard to *Clear Creek*, Samson did not present its summary-judgment proof until after the trial court rendered partial summary judgment on the

---

[56] 589 S.W.2d 671, 678-79 (Tex. 1979) (second emphasis added). *Clear Creek* predates Rule 166a(i), which was added in 1997 and authorizes summary judgment "on the ground that there is no evidence of one or more essential elements of a . . . defense on which an adverse party would have the burden of proof at trial." TEX. R. CIV. P. 166a(i); *see also* TEX. R. CIV. P. 166a(c) ("The motion for summary judgment shall state the specific grounds therefor."). Rule 166a(i) imposes certain procedural requirements including that the motion be specific and not general or conclusory. Further, a Rule 166a(i) motion may not be filed until "[a]fter an adequate time for discovery." TEX. R. CIV. P. 166a(i).

We need not consider in this case whether or how Rule 166a(i) impacts *Clear Creek*'s discussion of presenting proof "when necessary to establish a fact issue." 589 S.W.2d at 678. We note, however, that the procedure articulated in *Clear Creek* helps avoid abusive trial tactics that might ensue from in seriatim pleading of affirmative defenses, which could thwart expeditious disposition of "untenable defenses." *See id.* at 678 n.5 ("The function of the summary judgment is not to deprive a litigant of his right to trial by jury, but to eliminate patently unmeritorious claims and untenable defenses."). By the same token, we observe that (1) scheduling orders may be employed to avoid such tactics, and (2) all pleadings and motions are subject to good-faith requirements. *See* TEX. R. CIV. P. 13 (attorney must sign pleadings, motions, and other papers to certify that "the instrument is not groundless and brought in bad faith or . . . for the purpose of harassment"); *see also* TEX. CIV. PRAC. & REM. CODE §§ 9.001-10.006 (governing sanctions for frivolous pleadings, claims, and motions).

[57] Samson's response to the Unpooling Stakeholders' partial summary-judgment motion states:

Samson submits that its actions have breached no contract or violated any law. . . . In the second alternative, if the Court should disagree with Samson, the fact issue remains as to whether, if Samson lacked authority to amend and modify the [Black Stone Minerals] Unit, the Plaintiffs ratified, waived, or are estopped to now contest the amended unit by virtue of their long-standing acceptance of royalties on the basis of the amended unit.

[58] 980 S.W.2d at 463-64, 467 (policy exclusion was claimed as a defensive matter "for the first time in [the defendant's] motion for new trial" and not asserted in connection with cross-motions for summary judgment).

24

unpooling issue, but it did so in connection with a motion for reconsideration, before the unpooling claim had been fully adjudicated and prior to final judgment in the case. *Clear Creek* did not involve similar circumstances.

We have previously identified "important prudential considerations" underlying our preservation of error rules:

> First, requiring that parties initially raise complaints in the trial court conserves judicial resources by providing trial courts the opportunity to correct errors before appeal. Second, judicial decision-making is more accurate when trial courts have the first opportunity to consider and rule on error. Third, a party "should not be permitted to waive, consent to, or neglect to complain about an error at trial and then surprise his opponent on appeal by stating his complaint for the first time."[59]

In this case, the record reflects the trial court considered Samson's motion, as it had discretion to do,[60] and specifically ruled on it. This is sufficient to meet the preservation requirements of Rule 33.1. Accordingly, Samson's ratification defense was timely presented and ruled on by the trial court.[61]

Having concluded Samson preserved its ratification defense for appellate review, we now turn to the merits of the argument.

---

[59] *Mansions in the Forest, L.P. v. Montgomery Cty.*, 365 S.W.3d 314, 317 (Tex. 2012) (citing and quoting *In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003) (orig. proceeding)) (internal citations omitted).

[60] *See Hamrick v. Ward*, 359 S.W.3d 770, 779-80 (Tex. App.—Houston [14th Dist.] 2011) (concluding even if motion for summary judgment were an untimely response, affirmative defenses were preserved for appellate review because the record reflected the trial court considered the motion and evidence), *rev'd in part on other grounds*, 446 S.W.3d 377 (Tex. 2014).

[61] *See* TEX. R. APP. P. 33.1(a).

## 2. Application of *Hooks*

In *Hooks v. Samson Lone Star, Ltd. Partnership*, we considered Samson's ratification defense in a similar context against similarly situated stakeholders in the DuJay1/Amended Unit making similar unpooling claims regarding the amendment that renamed the pooling unit and redesignated its boundaries. We held Samson conclusively established ratification by the lessors based "solely on the facts that [the lessors] received notice of an amendment to the unit designation, accepted royalties from the amended unit, and [did] not challenge the amended unit."[62]

The Unpooling Stakeholders do not contest the court of appeals' conclusion that *Hooks* bars the claims of at least some of the unpooling claimants. As to the unpooling claimants challenging *Hooks*'s application, the claimants assert only that the record shows they did not "receive[] notice of an amendment to the unit designation," meaning they did not receive the same letter the *Hooks* lessors received notifying the DuJay1/Amended stakeholders that the Black Stone Minerals Unit was being amended as to its boundaries and name.[63] Samson contends the notice concerns in *Hooks* were satisfied as to the three unpooling claimants when they joined in the first amended petition against Samson, which included the unpooling complaints and described the amendment. We agree. While the claimants here did not receive notice of the amendment from Samson, the notice they received is functionally equivalent to the notice described in *Hooks* for ratification purposes.

---

[62] *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 66 (Tex. 2015).

[63] *Id.* at 65-66 (referring to a letter from Samson dated October 24, 2001, notifying the lessor of an "Amendment and Name Change of Black Stone Minerals 'A' No. 1 Unit Designation, Hardin County, Texas").

In *Hooks*, we explained that Samson's letter notifying the lessors of the pooling unit's "Amendment *and* Name Change" constituted notice of the amendment; even "[t]hough [the lessors] did not know exactly how Samson amended the unit designation," they were "nevertheless aware that Samson amended it."[64] The lessors in *Hooks* ratified the amendment because they "regularly accepted royalty checks for the [amended unit] without ever receiving royalties on the earlier designation[,] . . . having full knowledge that something had changed."[65] Importantly, we described the notice's effect as making the lessors aware that Samson had amended the unit, conferring "full knowledge that something had changed," even though the lessors may not have known exactly how the unit designation was changed.[66] The lessors' awareness followed by acceptance of royalties without challenging the amendment constituted ratification.[67]

Nothing in *Hooks* suggests that the specific method of notice—the letter from Samson to the lessors—was necessary as opposed to sufficient. Indeed, other means could suffice for ratification purposes.[68] Thus, if the claimants in this case had actual notice that Samson had amended the unit, they received the functional equivalent of the notice provided in *Hooks*. We conclude the record supports *Hooks*'s application to the unpooling claimants in this case.

---

[64] *Id.* at 66 (emphasis in original).

[65] *Id.*

[66] *Id.*

[67] *See id.*; *see also Smith v. Estill*, 28 S.W. 801, 805 (Tex. 1894) ("To constitute a ratification, it must appear that the acts relied upon were done with a full knowledge of all the facts, and with intent to adopt the unauthorized act in question.").

[68] *Cf. Montgomery v. Rittersbacher*, 424 S.W.2d 210, 214 (Tex. 1968) (noting that a principal can ratify the unauthorized acts of an agent by bringing a suit to enforce the unauthorized act).

27

In June 2005, the Simpson-Omohundro Foundation, Nancy Omohundro Long (Marlborough School's predecessor), and Gary Cruse as executor of Vivian Burch's estate, joined the first amended petition against Samson as plaintiffs.[69] The petition describes with specificity Samson's amendment of the pooling unit, even incorporating by reference the official public records wherein the amendment was filed.[70] These claimants were thusly made aware that not only had something changed with the unit designation, but exactly how Samson had amended the unit designation. Because it is undisputed that after joining the lawsuit the unpooling claimants continued to accept payments without challenging the DuJay1/Amended Unit, and following the analysis in *Hooks*, the record conclusively establishes they ratified the amendment.[71]

---

[69] The first amended petition does not include a filing date; however, the Unpooling Stakeholders do not dispute Samson's factual assertion that it was filed in June 2005.

[70] The petition describes the amendment as follows:

On or about February 20, 2002, Samson purported to retroactively amend the Black Stone A-1 Unit by filing an "Amendment to Designation of Gas Unit" at volume 1307, page 817 of the Official Public Records of Hardin County, Texas (incorporated herein by reference). The Amendment described a unit purportedly encompassing most or all of the same acreage under the Originally-Pooled Leases as in the Black Stone A-1 Unit, but the Amendment's plat depicted a unit comprising only 570.962 acres, with just 80 of the previously designated 218 acres of Black Stone Minerals land (on which the Black Stone A-1 Well had been drilled). The Amendment also said the original Designation had, by "inadvertent error," purported to cover production from 6,000 feet to 13,800 feet subsurface, but that, in fact, the Designation "was intended to cover" only production occurring from a subsurface depth of 12,400 feet or deeper-**below** the completion depth (12,238 to 12,359 feet) of the Black Stone A-1 Well. If effective, this revised pooled depth removed the Black Stone A-1 Well from its namesake unit, because the well was completed shallower than the pooled depths. However, the Dujay No. 1 Well was located within the area and depths described in the Amendment, which further purported to rename the unit the Joyce DuJay No. 1 Gas Unit (the "DuJay 1 Unit").

[71] The Unpooling Stakeholders also argue that pursuant to Rule 11 agreements connected with division orders that were executed in December of 2007, Samson agreed the Unpooling Stakeholders were not waiving any of their claims by signing the division orders or accepting royalty payments. However, the Rule 11 agreements only discussed signing the division order, not accepting royalty payments: "[B]y signing the Division Order, Owner does not waive, limit, or in any way affect any of Owner's claims in the subject lawsuits, including without limitation any claim concerning the revenue interest credited to Owner." Because we neither rely on the division orders in our holding nor find the Rule 11 Agreements applicable to royalty payments accepted before the 2007 division orders were executed,

28

### E. Proportionate-Reduction Clause

Finally, we consider the Overlapping Unit Stakeholders' assertion that the damages awarded for breach of contract were erroneously reduced based on the proportionate-reduction clause in the Reed lease. The stakeholders argue the proportionate-reduction clause does not apply because the lease conveyed no more than their 50% mineral interest. We disagree.

The Reed lease conveyed "all that certain land situated in Jefferson County, Texas, and described in Exhibit A hereto . . . .'" Exhibit A to the lease described the "land" as encompassing ten tracts which total "399.12025 net mineral acres in and to 826.997 acres of land." One of those tracts is described as comprising "113.91700 net mineral acres in and to 227.834 acres," meaning the lessor owned a 50% undivided mineral interest in that tract. With the lessor's consent, Samson pooled 213 acres of the 227.834 acres into the DuJay-A (Overlapping) Unit. The pooled acreage was thereafter denominated "Tract 1."

The formula for calculating royalties from the pooled unit is specified in section VIII(b) of the Reed lease.[72] To determine the royalty payments, the lease requires Samson to calculate the

we need not address this argument.

[72] The section, in its entirety, reads:

**Computing Royalties.** For the purpose of computing the royalties to which owners of royalties and payments out of production shall be entitled on production of oil and gas, or either of them, from the pooled unit, there shall be allocated to the land covered by this lease and included in said unit a pro rata portion of the oil and gas, or either of them, produced from the pooled unit after deducting that used for operations on the pooled unit. Such allocation shall be on an acreage basis, that is, there shall be allocated to the acreage covered by this lease and included in the pooled unit that pro rata portion of the oil and gas, or either of them, produced from the pooled unit which the number of surface acres covered by this lease and included in the pooled unit bears to the total number of surface areas included in the pooled unit. Royalties hereunder shall be computed on the portion of such production, whether it be oil and gas, or either of them, so allocated to the land covered by this lease and included in the unit, just as though such production were from such land. The production from or operations

owner's royalty-revenue interest by dividing the 213 acres in Tract 1 by the DuJay-A Unit's 704 total acres, with the quotient multiplied by the lessor's 1/4 royalty and the value of the production allocated to that tract. The parties do not dispute the royalty calculations required under section VIII(b).

Rather, the dispute concerns application of the proportionate-reduction clause, which Samson argues, and the lower courts found, requires a 50% reduction in the royalty payments to the Overlapping Unit Stakeholders. The proportionate-reduction clause is located in section XIII of the lease, governing "Warranty of Title."[73] The clause provides that the "royalties, delay rental, and other monies" owed under the lease "shall be paid only in the proportion which the interest therein covered by this lease bears to the whole or undivided fee simple estate therein." Under the terms of the lease, proportionate reduction is authorized if the lease "covers a less interest in the oil and gas

_____

on an oil well will be considered as production from or operations on the lease or oil pooled unit from which it is producing and not as production from or operations on a gas pooled unit; and production from or operations on a gas well will be considered as production from or operations on the lease or gas pooled unit from which it is producing and not an oil pooled unit.

[73] Section XIII Warranty Of Title reads in full as follows:

Each Lessor does, to the extent of the undivided interest owned by them, their heirs, successors or assigns and to the extent of the undivided interest owned by the Reed Heirs, and no further, hereby warrant and agree to defend the title to said interests hereby leased by it unto the said Lessee and Lessee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through, or under it or the Reed Heirs, but not otherwise. In the event the Lessor under this lease shall incur any liability on the warranties provided for herein, it is agreed that such liability shall be limited to the amounts paid to Lessor and the Reed Heirs under this lease. *It is agreed that if this lease covers a less interest in the oil and gas in all or any part of the leased premises than the entire undivided fee simple estate, then the royalties, delay rental, and other monies accruing from any part as to which this lease covers less than such full interest shall be paid only in the proportion which the interest therein covered by this lease bears to the whole or undivided fee simple estate therein.* (Emphasis added.)

in all or any part of the leased premises than the entire undivided fee simple estate." Samson claims

the proportionate-reduction clause applies; the Overlapping Unit Stakeholders assert it does not.

"'An oil and gas lease is a contract, and its terms are interpreted as such.'"[74] Although the

parties do not agree about the proper construction of the lease, both assert the lease is unambiguous.

Ambiguity does not arise merely because the parties provide different interpretations.[75] Rather,

ambiguity is a question of law for the court,[76] and the proper construction of an unambiguous lease

is a question of law determined de novo.[77]

A proportionate-reduction clause protects the lessee from paying the lessor more royalties

than are due if the lessor owns less than the entire fee simple estate in the leased premises:[78]

> Even though a lessee knows a lessor owns less than the full fee title to the premises
> on which a lease is sought he often, if not usually, prepares and insists upon a lease
> which purports to convey the entire fee in order to make certain that no fractional
> interest is left outstanding in the lessor. He is protected against the possibility of
> being forced to pay royalty on a greater interest than that actually owned by the lessor
> by the inclusion of a standard proportionate reduction clause in the lease.[79]

---

[74] *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 210 (Tex. 2011) (quoting *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005)).

[75] *N. Shore Energy, L.L.C. v. Harkins*, 501 S.W.3d 598, 602 (Tex. 2016).

[76] *Anadarko Petrol. Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002).

[77] *Id.*

[78] *See Aycock v. Vantage Fort Worth Energy, LLC*, No. 11-13-00338-CV, 2015 WL 1322003, at *2 (Tex. App.—Eastland Mar. 20, 2015, pet. denied) (mem. op.) ("A proportionate reduction clause acts to protect the lessee from paying the lessor more than what the lessor is due . . . ."); 3 EUGENE KUNTZ, THE LAW OF OIL AND GAS § 52.4 (1989) ("The lesser interest clause, sometimes called the 'proportionate reduction clause,' is specifically designed to modify the delay rental provisions of the drilling clause and the royalty clause to provide for a reduction in the amount of those payments if the lessor should own less than the entire fee simple estate in the leased premises.").

[79] *McMahon v. Christmann*, 303 S.W.2d 341, 346 (Tex. 1957).

The fractional part of royalties a party receives under a mineral lease is "usually or normally" the same as the party's fractional mineral interest, but the parties "'may make it different if they intend to do so, and plainly and in a formal way express that intention.'"[80]

Thus, as with all contracts, the language of the lease controls. The dispositive question here is whether the Reed lease "covers a less interest in the oil and gas in all or any part of the leased premises than the entire undivided fee simple estate." Samson asserts the clause is triggered because the lessor owns only a 50% mineral interest in Tract 1, which is a "less interest in the oil and gas . . . than the entire undivided fee simple estate." While concurring that a proportionate-reduction clause would ordinarily operate in the manner Samson suggests, the Overlapping Unit Stakeholders assert the language in the Reed lease is unique and compels a different result in this case. The stakeholders contend the phrase "leased premises" refers to the net mineral acreage actually conveyed, not the gross acreage. Thus, according to the stakeholders, the lease conveyed the entire fee simple estate in their 50% mineral interest, rendering the proportionate-reduction clause inapplicable.

In effect, the parties propose two alternative constructions of the proportionate-reduction clause:

1.  Samson's construction: the lease covers an undivided 50% interest in the oil and gas in all or any part of the total acreage of "all that certain land," which is less than the entire undivided fee simple estate of the total acreage of "all that certain land."

2.  The stakeholders' construction: the lease covers a 100% interest in the oil and gas in all or any part of the net acreage, which is equivalent to the entire undivided fee simple estate of the net acreage.

---

[80] *Gibson v. Turner*, 294 S.W.2d 781, 786 (Tex. 1956) (quoting *Benge v. Scharbauer*, 259 S.W.2d 166, 169 (Tex. 1953)).

We agree with Samson's construction of the lease. It offers the only natural reading of the proportionate-reduction clause's language and captures the unambiguous meaning of the clause when viewed in light of the entire lease.[81]

The lease's granting clause states "Lessor . . . hereby leases exclusively to Lessee . . . all that certain land situated in Jefferson County, Texas, and described in Exhibit A hereto which land is herein sometimes referred to as 'the land,' 'said land,' or 'the leased premises.'" We have explained that "'land' includes the surface of the earth and everything over and under it, including minerals in place . . . a description of land includes the land and all the minerals naturally existing underneath."[82] Thus, "all that certain land"—or "the leased premises"—references the entire land within which is found the stakeholders' 50% undivided mineral interest.[83] The stakeholders' attempt to distinguish "the leased premises" from "land" is belied by the lease's statement that "all that certain land" is "herein sometimes referred to as 'the land,' 'said land,' and 'the leased premises.'"

The stakeholders, relying on Exhibit A referenced in the granting clause, assert "the leased premises" refers not to the total acreage of "all that certain land" but to the stakeholders' net mineral acreage. Exhibit A describes the land as "399.12025 net mineral acres in and to 826.997 acres of land, more or less, in the William Dyches Survey, Abstract No 112, and the Josiah Dyches Survey,

---

[81] *Anadarko*, 94 S.W.3d at 554 (when construing a lease, "[w]e examine the entire lease and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent").

[82] *Averyt v. Grande, Inc.*, 717 S.W.2d 891, 894 (Tex. 1986) (citing 1 Thompson on Real Property § 51 (1939)).

[83] *See King v. First Nat'l Bank of Wichita Falls*, 192 S.W.2d 260, 262-63 (Tex. 1946) ("looking forward from the granting clause and backward from the reservation clause it seems evident that the terms 'following described land', 'hereinabove described land', 'said land', and 'premises', refer not to the one-half interest actually conveyed," but instead "refers to the entire land").

Abstract No 111, of Jefferson County Texas" and the land that became Tract 1 as "113.91700 net mineral acres in and to 227.834 acres, situated in the William Dyches Survey, Abstract No. 112."

However, the granting clause explains the purpose of Exhibit A as "describ[ing]" "all that certain land." "'[T]o describe land is to outline its boundaries so that it may be located on the ground, and *not to define the estate conveyed therein*.'"[84] Although Exhibit A distinguishes between net acres and gross acres, it is describing "all that certain land" as "826.997 acres of land, more or less" and outlining the boundaries of the land through surveys so that "all that certain land" may be located on the ground. The lease further connects "the land" with the total acreage when it explains "[f]or the purpose of calculating the payments hereinafter provided for, the land included within the terms of this lease is estimated to comprise 826.997 mineral acres [the gross acreage], and the leased premises shall be deemed to contain the acreage recited therefor." Accordingly, we conclude the term "leased premises" unambiguously refers to "all that certain land" or, in other words, the land with boundaries as described by Exhibit A.

The stakeholders further attempt to distinguish "leased premises" from "land" by pointing to other provisions within the lease. For example, one provision provides for a gas royalty on all gas "produced from the leased premises and sold or used[] for which no royalty is otherwise specified in this lease" and another provision provides for a shut-in royalty "[i]f there shall be a well on the leased premises capable of producing gas" but the gas is not "sold or used off the leased premises." But these provisions function logically if "leased premises" is construed as the "land" on which the

---

[84] *Averyt*, 717 S.W.2d at 894 (quoting *Sharp v. Fowler*, 252 S.W.2d 153, 154 (Tex. 1952)) (emphasis in original).

well is located or the gas produced, thereby supporting the synonymity between "leased premises" and "land." No language in these provisions or any other provision of the lease leads us to conclude that the phrase "leased premises" in the proportionate-reduction clause means anything other than "all that certain land."

Notwithstanding the lease's language, the stakeholders argue *Texas Co. v. Parks* compels the opposite conclusion.[85] We disagree. In *Parks*, a Texas intermediate appellate court considered whether a similar proportionate-reduction clause applied to delay rentals when the lease "convey[ed] the whole leasehold interest of grantors in and to an undivided one-half interest."[86] The clause applied "if lessor owns an interest in said land less than the entire fee simple estate."[87] The lease required delay rentals of $160, but the lessee paid only $80 because the proportionate-reduction clause, by its terms, applied to delay rentals.[88] The court concluded, however, that "the agreement to pay $160 rental on said land referred to the undivided one-half interest in the whole tract" and therefore the proportionate-reduction clause did not apply because the lessor "owned the entire fee simple in what they conveyed, to-wit, their undivided one-half interest."[89] The court explained that

---

[85] 247 S.W.2d 179 (Tex. Civ. App.—Fort Worth 1952, writ ref'd n.r.e.).

[86] The court described the proportionate-reduction clause as "if lessor owns an interest in said land less than the entire fee simple estate, then the rentals shall be reduced proportionately." *Id.* at 182.

[87] *Id.*

[88] *Id.* at 181.

[89] *Id.* at 182.

35

"[t]he property referred to as the land is the same as that actually owned and conveyed by the lessors."[90]

On rehearing, the appellate court implied that the *Parks* holding is limited to delay rentals, not royalties.[91] But even if the opinion also applies to royalties, we find the case distinguishable on its facts and, thus, inapplicable.

In *Parks*, the lease's granting clause "only describes the interest lessor is to convey, which description is referred to in the instrument as 'said lands' or 'lands above described,'" i.e., "an undivided one-half interest in the E/2 of Sec. 208, Block D."[92] And the proportionate-reduction clause refers to this interest by referencing "said land."[93] Here, in contrast, the lease's granting clause refers to "all that certain land" and notes that "leased premises" refers to that land. In this case, unlike in *Parks*, the "entire undivided fee simple estate" in the proportionate-reduction clause is referring to the entire undivided fee simple estate of "all that certain land," not of a one-half

---

[90] *Id.*

[91] *Id.* at 184. The court said:

> Neither do we agree with appellant's argument that the effect of our opinion "is to place in jeopardy the right of the lessee to reduce royalty under every producing oil and gas lease in this State in which an undivided or fractional interest was described, rather than the entire fee simple interest, in the granting clause." Looking to the description of the land leased, we believe the lessee, or his assigns, would have no difficulty in determining the amount of royalty interest which appellees should receive if and as oil is produced from said land. We need not state here that a formula used or the reason given for determining amount of rental due under a lease should necessarily be the same formula used to ascertain proportionate royalty interests in the oil if and when produced.

*Id.*

[92] *Id.* at 181, 183.

[93] *Id.* at 182.

36

undivided interest. Accordingly, the stakeholders' interest is less than the entire undivided fee simple estate and the proportionate-reduction clause is triggered, while in *Parks* the one-half undivided interest was the entire undivided fee simple estate and the clause was not triggered.

Based on the lease's use of the term "leased premises," we conclude the lease "covers a less interest in the oil and gas in all or any part of the leased premises than the entire undivided fee simple estate" because the lessor's 50% undivided mineral interest in the leased premises is less than the entire undivided fee simple estate of the leased premises. We therefore hold the lower courts properly applied the proportionate-reduction clause.

### III. Conclusion

We affirm the court of appeals' judgment for the reasons stated.

_____
Eva M. Guzman
Justice

**OPINION DELIVERED**: June 23, 2017

37