

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-18-00636-CV

Margaret Ann **STRICKHAUSEN**,
Appellant

v.

**PETROHAWK OPERATING COMPANY** n/k/a BHP Billiton Petroleum (TxLa) Operating
Company; Petrohawk Properties, LP n/k/a BHP Billiton Petroleum Properties (N.A.), LP;
Segundo Navarro Drilling, Ltd.; First Rock I, LLC; EF Non-Op, LLC;
and CEU Hawkville, LLC n/k/a South Texas Shale, LLC,
Appellees

From the 218th Judicial District Court, La Salle County, Texas
Trial Court No. 14-08-00130-CVL
Honorable Russell Wilson, Judge Presiding

Opinion by:   Sandee Bryan Marion, Chief Justice

Sitting:   Sandee Bryan Marion, Chief Justice
Beth Watkins, Justice
Liza A. Rodriguez, Justice

Delivered and Filed: April 24, 2019

REVERSED AND REMANDED

This is a permissive appeal of an amended order on motions for summary judgment which

identifies the controlling question of law as "Plaintiff's ratification of 1) the pooled units and/or 2)

Defendants' breach of the no pooling clause of the lease."  In her brief, appellant Margaret Ann

Strickhausen presents four issues, asserting:

(1) her depositing of royalty checks for production from the improperly pooled
unit did not constitute a ratification given express language in the lease that

(a) contractually eliminates any form of implicit ratification; and (b) sets out the only procedure by which she can make an express ratification;

(2) she is not estopped from denying she ratified the pooled unit because she would have been entitled to royalties on production from the property in which she owns a mineral interest;

(3) she was required to deposit the royalty checks in mitigation of her damages, precluding such acts from constituting a ratification; and

(4) she could not have made an unintentional, implicit ratification in light of the "duty of utmost good faith and fair dealing" the appellees owed her under the lease.

We reverse the portion of the trial court's order granting summary judgment in favor of the appellees on the affirmative defense of ratification as it relates to the no pooling clause of the lease and remand the cause to the trial court for further proceedings.

## BACKGROUND

Strickhausen owns a fifty percent undivided mineral interest in a tract of land (the "Property) in La Salle County located in the Hawkville (Eagle Ford Shale) Field. The other fifty percent undivided mineral interest is owned by Delphine Crouch and others (collectively referred to herein as "Crouch"). Both Strickhausen and Crouch entered into leases with Escondido Resources II, LLC. Those leases were later assigned, and the appellees are the current lessees who collectively own all of the working interest in the Property's minerals at the depths of the Eagle Ford Shale.

Although the Crouch lease allowed pooling, the Strickhausen lease prohibited pooling without Strickhausen's express written consent, providing, "Notwithstanding any provision or reference contained in this Lease agreement to the contrary, pooling for oil or gas is expressly denied and shall not be allowed under any circumstances without the express written consent of the Lessor named herein." In addition, the Strickhausen lease contained a provision entitled "Future Documents" which provided:

At any time during the term of this Lease if Lessee requires Lessor to execute any document, including division orders or any other agreement connected in any way to this Lease or the minerals extracted from the Leased Premises, Lessee agrees that Lessor's execution of such agreement(s) shall not, irrespective of the language contained therein, constitute a waiver, acceptance, ratification, revivor or adoption of this Lease or a waiver of any claim, demand or cause of action Lessor or any royalty owner may have or claim for any breach of an expressed or implied obligation arising out of or in any way connected with this Lease unless such document expressly states that its purpose is the acceptance, ratification, revivor or adoption of a prior questionable lease or waiver of a claim or defense and such document is agreed to after and upon advise [sic] of Lessor's counsel, with such counsel indicating his concurrence by signing such document or a separate letter so stating. Further, Lessee agrees to reimburse Lessor for reasonable attorney's fees incurred by Lessor in connection with Lessor's attorney's review of such agreements.

Notwithstanding the prohibition against pooling in the Strickhausen lease without express written consent, the appellees filed documents designating a pooled unit named White Kitchen Unit No. 4 ("WK Unit 4") effective January 1, 2012, which pooled five different leases, including the Strickhausen and Crouch leases. Like the Crouch lease, the other three leases allowed pooling.

On September 20, 2012, a landman sent Strickhausen a letter requesting that she execute a ratification of the WK Unit 4 and a pooling consent agreement. Strickhausen contacted her attorney, Frank Armstrong.

By letter dated October 12, 2012, Armstrong responded to the landman's letter, noting he had been advised by email that the "'WK4-1H' began flowing to sales at 12pm on 8/16/12." Armstrong's letter quoted the provision of Strickhausen's lease that prohibited pooling and asserted, "it appears that the referenced Lease has been pooled, notwithstanding the fact that the express terms of the Lease prohibit pooling." Armstrong's letter then posed a series of questions including questions regarding: (1) the appellees' authority to pool; (2) when drilling operations on the well commenced; (3) who was responsible for payment of royalties under the Strickhausen lease; (4) whether royalties would be suspended if Strickhausen elected not to sign the ratification;

and (5) the manner in which royalties would be paid if Strickhausen elected not to execute the ratification.

On December 21, 2012, a representative of the appellees, Shane S. Duvall, responded to Armstrong's letter conceding the appellees commenced drilling operations on the "WK Unit 4, #1H well" on April 20, 2012. The letter stated the appellees believed they proposed a fair and reasonable method of payment for the royalty based on a tract participation factor using acreage figures but noted a second method of calculating the royalty would be to calculate payments "based on the drainhole length of the perforated lateral drilled on each of the three individual tracts." The letter included calculations based on both methods, but noted the second method would require all lessors to execute a Production Sharing Agreement. The letter again requested that Strickhausen execute the ratification and concluded, "Should an alternative method of payment or action be required the royalties will require being placed in suspense."

On February 20, 2013, Strickhausen was sent a check in the amount of $269,901.73 for the royalty she was owed for production from the well on the pooled unit. The face of the check showed the payment was for production from "WK Unit 4 1H."

On March 8, 2013, Armstrong sent the appellees a letter acknowledging receipt of a March 1, 2013 email from appellees containing an offer to settle the issue of the wrongful pooling of the Strickhausen lease. Armstrong's letter stated Strickhausen rejected the appellees' offer and, instead, made a counter-offer. The letter stated Strickhausen's counter-offer expired on March 18, 2013.

After Armstrong's March 8, 2013 letter, Strickhausen deposited the February 20, 2013 royalty check which posted for payment on March 12, 2013. Thereafter, Strickhausen continued

to receive and deposit numerous additional royalty checks and had been paid in excess of $590,000 by the time she filed the underlying lawsuit on August 1, 2014.[1]

In 2017, Strickhausen and the appellees began filing motions for summary judgment. Strickhausen's motion focused on the appellees' breaches of various provisions of the Strickhausen lease including the breach of the pooling provision, while the appellees' motion focused on the affirmative defenses of ratification and estoppel. On September 25, 2017, the trial court signed an order granting and denying each motion in part. On August 23, 2018, the trial court signed an amended order granting the permissive appeal. As previously noted, the trial court's order stated the controlling question of law is "Plaintiff's ratification of 1) the pooled units and/or 2) Defendants' breach of the no pooling clause of the lease." The order also contains the trial court's ruling as follows:

> *Competing Motions of Summary Judgment for Breach of No Pooling Clause.*
> Both attempts at pooling breached the lease's no pooling clause, but Plaintiff ratified that breach by accepting, and negotiating, royalty checks from the pooled units. Even if it was not Plaintiff['s] intention to ratify the pooled units, she is estopped, as a matter of law, from denying that she did so.
> Assuming, without deciding, that the right to assert any, or all, forms of quasi-estoppel may be waived by contract, Defendants did not do that in this lease. Defendants waived the right to obtain a written ratification from Lessor, unless her counsel consented. Defendants did not waive their right to assert estoppel for her implied ratification by negotiating the royalty checks. Plaintiff's Motion for Summary Judgment for Breach of Pooling is DENIED, and Defendants' Cross Motion for Summary Judgment for Breach of Pooling is GRANTED.

This court previously granted Strickhausen's petition for permission to appeal, and the parties have fully briefed the four issues summarized above.

---

[1] After filing the lawsuit, Strickhausen continued to negotiate and deposit royalty checks, and Strickhausen's expert testified at his March 2017 deposition that Strickhausen had been paid $714,000.00.

**STANDARD OF REVIEW**

We review summary judgments de novo. *Tex. Workforce Comm'n v. Wichita Cty.*, 548 S.W.3d 489, 492 (Tex. 2018). "When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018) (internal quotation omitted).

"Summary judgment is proper when no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Tex. Workforce Comm'n*, 548 S.W.3d at 492. "Undisputed evidence may be conclusive of the absence of a material fact issue, but only if reasonable people could not differ in their conclusions as to that evidence." *Schlumberger Tech. Corp. v. Pasko*, 544 S.W.3d 830, 833 (Tex. 2018) (internal quotation omitted).

"When the parties file competing summary judgment motions and the trial court grants one and denies the other, we consider the summary judgment evidence presented by both sides, determine all questions presented, and if the trial court erred, render the judgment the trial court should have rendered." *Tex. Workforce Comm'n*, 548 S.W.3d at 492 (internal quotation omitted).

**HORIZONTAL DRILLING AND POOLING**

Production from the Eagle Ford Shale has been made possible by advances in horizontal drilling. *See Green v. Chesapeake Expl., L.L.C.*, No. 02-17-00405-CV, 2018 WL 6565790, at *5 n.13 (Tex. App.—Fort Worth Dec. 13, 2018, no pet. h.) (mem. op.). Rather than drilling vertical wells on a single tract, horizontal wells are drilled that traverse the shale formation underlying multiple tracts. "Horizontal wells are initially drilled vertically, and then at a pre-determined point, the drillstem deviates and proceeds horizontally into the targeted formation." *Browning Oil Co. v. Luecke*, 38 S.W.3d 625, 634 (Tex. App.—Austin 2000, pet. denied). "A wellbore can extend

across several acres and several leased tracts." *Id.* "Each tract traversed by the horizontal wellbore is a drillsite tract, and each production point on the wellbore is a drillsite." *Id*.

Because horizontal wells traverse multiple tracts, pooling of numerous oil and gas leases on those multiple tracts is often required. "Pooling allows a lessee to join land from two or more leases into a single unit." *Id*. "The primary legal consequence of pooling is that production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit." *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 774-75 (Tex. 2017).

"[O]il and gas leases in general, and pooling clauses in particular, are a matter of contract." *Id*. at 774 (internal quotation omitted). "A lessee's authority to pool requires the lessor's consent, which is typically furnished via a pooling provision in the mineral lease." *Id*. "Pooling is valid only if done in accordance with the method and purposes specified in the lease." *Id*. (internal quotation omitted). "A pooled unit that does not comply with the terms of the pooling agreement is invalid and unenforceable absent the lessor's ratification." *Id*.

### RATIFICATION

"Ratification occurs when a person who knows all the material facts confirms or adopts a prior act that did not then legally bind him and which he could have repudiated." *Bank of Am., N.A. v. Prize Energy Res., L.P.*, 510 S.W.3d 497, 505 (Tex. App.—San Antonio 2014, pet. denied) (internal quotation omitted). "Proof of ratification requires evidence establishing (1) approval by act, word, or conduct, (2) with full knowledge of the facts of the earlier act, and (3) with the intention of giving validity to the earlier act." *Id*. at 505-06 (internal quotation omitted).

The Texas Supreme Court has recently addressed ratification in the context of pooling in *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52 (Tex. 2015).[2] The Texas Supreme Court

---

[2] Although the appellees rely on other cases in their brief, the Texas Supreme Court's decision in *Hooks* is controlling in its analysis of when ratification in the pooling context is established as a matter of law.

applied its holding in *Hooks* in *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 781-86 (Tex. 2017), in which it further clarified the facts.

Samson Lone Star Limited Partnership, which later became known as Samson Exploration, LLC, created a pooled unit which it named Black Stone Minerals A No. 1 Gas Unit (the "Original Unit") and drilled two wells within the pooled unit's boundaries. *Samson Expl., LLC*, 521 S.W.3d at 771. One well was located on the Black Stone lease, and the other well was located on the Joyce DuJay lease. *Id*. Because the owner of 87.5% of the mineral interest in the Black Stone lease exercised its contractual right against pooling, Samson amended the designation of the Original Unit to change its boundaries and exclude the well located on the Black Stone lease. *Id*.; *Hooks*, 457 S.W.3d at 65. Samson renamed the amended pooled unit the Joyce DuJay No. 1 Gas Unit (the "Amended Unit"). *Samson Expl., LLC*, 521 S.W.3d at 771; *Hooks*, 457 S.W.3d at 65. Samson sent letters to most of the lessors of the pooled leases notifying them of the amendment and name change which was effective in January 2002, when production began. *Samson Expl., LLC*, 521 S.W.3d at 784; *Hooks*, 457 S.W.3d at 65. Samson paid the Amended Unit's lessors royalties on production from the well located on the Joyce DuJay lease but not on production from the well located on the Black Stone lease. *Hooks*, 457 S.W.3d at 65.

In *Hooks*, parties collectively referred to as "Hooks" sued claiming they were entitled to royalties on production from both wells located on the Original Unit contending Samson did not have the authority to "unpool" the Black Stone lease. 457 S.W.3d at 65. The trial court agreed, but the court of appeals held Hooks ratified the Amended Unit by accepting royalties on it, and therefore could not recover royalties on the Original Unit. *Id*.

The Texas Supreme Court noted Hooks' lease authorized Samson to pool. *Id*. The court further noted Hooks' lawsuit did not question the validity of the Amended Unit but alleged Samson owed royalties on both the Original Unit and the Amended Unit. *Id*. at 65-66.

Describing Hooks' position as problematic, the court noted the letter to Hooks referred to an amendment and name change; therefore, Hooks "should have been aware that the pooled area could change." *Id*. at 66. In addition, the court stated "[t]he original designation and the amended designation, as well as their differences, were a matter of public record." *Id*. Finally, the court noted Hooks regularly accepted royalty checks for the Amended Unit without ever receiving royalties on the Original Unit. *Id*. The court then held:

> Under these circumstances, Hooks cannot claim additional royalties from the older unit because Hooks ratified the amendment, having full knowledge that something had changed and by his actions consenting to it, failing even to challenge the new unit. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 677 (Tex. 2000). Because Hooks does not deny the validity of the new unit, one that existed only after Hooks was notified that the old unit was being amended, Hooks cannot later assert that he should also receive royalties from the old unit. *See Ohrt v. Union Gas Corp.*, 398 S.W.3d 315, 329 (Tex. App.—Corpus Christi 2012, pet. denied) ("Prolonged silence or inaction in not asserting a known right is conduct that may amount to waiver."); *see also Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 195 (Tex. App.—Dallas 2013, no pet.) ("Any act inconsistent with an intent to avoid a contract has the effect of ratifying the contract."). Because of the undisputed contents of the notice letter, Hooks' acceptance of royalties for the new unit, and Hooks' refusal to challenge the new unit, we decide the question of ratification as a matter of law.

*Id*. The court then explained the basis for its holding as follows:

> We base our holding solely on the facts that Hooks received notice of an amendment to the unit designation, accepted royalties from the amended unit, and does not challenge the amended unit.

*Id*.

Two years later, the Texas Supreme Court applied its holding in *Hooks* to claims made by other lessors of the Amended Unit. *See Samson Expl., LLC*, 521 S.W.3d at 784-86. The court noted it held Samson conclusively established ratification in *Hooks* "'solely on the facts that [the lessors] received notice of an amendment to the unit designation, accepted royalties from the amended unit, and [did] not challenge the amended unit.'" *Id*. at 784 (quoting *Hooks*, 457 S.W.3d at 66). Although most of the appellants in *Samson Expl., LLC* did not contest the application of

*Hooks*, three lessors asserted they did not receive the letter Hooks received notifying them of the amendment and name change. *Id*. The court rejected this distinction, noting the three lessors received sufficient notice when they joined the lawsuit against Samson which described the amendment. *Id*. at 785. The court concluded, "Because it is undisputed that after joining the lawsuit the [three lessors] continued to accept payments without challenging the [Amended] Unit, and following the analysis in *Hooks*, the record conclusively establishes they ratified the amendment." *Id*. at 785-86.

In her brief, Strickhausen contends *Hooks* is distinguishable from the instant case for numerous reasons. First, Strickhausen contends the lease in *Hooks* allowed pooling while the Strickhausen lease prohibited pooling absent express written consent. Although this is a factual distinction, we disagree that it affects our analysis of the ratification issue. The appellees' violation of the pooling provision in the lease establishes they breached the lease. As described in *Hooks*, ratification looks to Strickhausen's actions in accepting the royalty payments following the breach. In fact, the court in *Hooks* assumed a breach based on Samson's amending of the unit. Therefore, the provision in the lease prohibiting pooling is not a relevant distinction because the manner in which the lease was breached does not affect the ratification analysis.

Strickhausen also contends ratification was prohibited by the Future Documents clause. The Future Documents clause, however, addresses documents the appellees as lessees "require" Strickhausen to execute. The appellees did not "require" Strickhausen to execute the royalty checks. Strickhausen chose to endorse the royalty checks to receive the funds those checks represented.

Instead, the most important distinction that exists between the instant case and *Hooks* is the third basis for the court's holding, i.e., Hooks did not "challenge the amended unit." 457 S.W.3d at 66. The summary judgment evidence in the instant case established Strickhausen

immediately challenged the pooling of her lease, and her attorney exchanged letters and email correspondence with the appellees detailing that challenge. In her affidavit, Strickhausen stated she remained opposed to the attempt to pool her lease "[d]uring all relevant times throughout Mr. Armstrong's negotiation of [a] ratification of the [pooled unit] through the filing of the Lawsuit." Similarly, Armstrong's affidavit stated:

> After learning of the White Kitchen No. 4 Gas Unit and the Well's existence, I began a several-months-long negotiation with a representative of Defendant Petrohawk Operating Company to reach a settlement of the wrongful pooling of the Subject Lease and other breaches of the Subject Lease. Throughout these negotiations until the filing of this lawsuit, I made it clear to the Defendants' representative that Plaintiff would not ratify the pooling of the White Kitchen No. 4 Gas Unit until a favorable settlement could be reached.

Because the *Hooks* decision was based on the lessor not challenging the pooled unit for which royalties were being paid, and the summary judgment evidence in this case raises a question of fact regarding Strickhausen's ongoing challenge of the pooled unit, the trial court erred in concluding Strickhausen ratified the pooled unit as a matter of law. As previously noted, this court has stated ratification generally requires evidence establishing "(1) approval by act, word, or conduct, (2) with full knowledge of the facts of the earlier act, and (3) with the intention of giving validity to the earlier act." *Bank of Am., N.A.*, 510 S.W.3d at 505-06. The *Hooks* decision appears to stand for the legal proposition that if the lessor challenges the pooled unit, the evidence cannot conclusively establish as a matter of law the lessor's "intention of giving validity to the earlier act" of pooling. Therefore, the summary judgment evidence raises a genuine issue of material fact precluding summary judgment on the issue of ratification as it relates to the no pooling clause of the lease.

#### ESTOPPEL

In her second issue, Strickhausen poses the following question: "Whether Strickhausen is estopped to deny that she made a ratification by depositing royalty checks for production from the

improperly pooled unit even though she would have been entitled to royalties on production from her property under any circumstances." After concluding Strickhausen ratified the pooled unit, the trial court's order further stated: "Even if it was not Plaintiff['s] intention to ratify the pooled units, she is estopped, as a matter of law, from denying that she did so." The order also stated, "Defendants did not waive their right to assert estoppel for her implied ratification by negotiating the royalty checks."

The trial court's estoppel finding appears to be limited to Strickhausen being estopped from denying an implied ratification. Thus, we interpret the trial court's order to mean Strickhausen is estopped from asserting she did not intend to ratify the pooled unit because she impliedly ratified the pooled unit through her actions, regardless of her actual intent. We believe the trial court made this finding because the third element in a traditional ratification analysis requires evidence that the person have "the intention of giving validity to the earlier act." *Bank of Am., N.A.*, 510 S.W.3d at 505-06. As we have previously held, the summary judgment evidence in this case raised a fact issue on this third element as *Hooks* defines it for purposes of implied ratification in the pooling context. This fact issue precluded the trial court from granting summary judgment.

If we have misread the trial court's order and the trial court intended to make broader findings regarding estoppel independent of the affirmative defense of ratification, we hold any issue relating to such broader estoppel findings would be beyond the scope of the controlling issue governing this permissive appeal. "We strictly apply statutes granting interlocutory appeals because they are a narrow exception to the general rule that interlocutory orders are not immediately appealable." *CMH Homes v. Perez*, 340 S.W.3d 444, 447 (Tex. 2011). The scope of a permissive appeal is limited to consideration of the controlling question of law identified in the trial court's order. *Tex. Windstorm Ins. Ass'n v. Jones*, 512 S.W.3d 545, 552 (Tex. App.—Houston [1st Dist.] 2016, no pet.). Although the trial court's order addresses Strickhausen being estopped

from denying her implied ratification by negotiating the royalty checks, the controlling question of law identified in the order is Strickhausen's "ratification of 1) the pooled units and/or 2) Defendants' breach of the no pooling clause of the lease."  The trial court's order also states, "If the courts of appeals affirm the ratification findings of this Amended Order on Motions for Summary Judgment, the amount of litigation necessary to conclude this matter will significantly decrease."  Ratification and estoppel are separate defenses with separate elements that must be proven.  *Compare Samson Expl., LLC*, 521 S.W.3d at 784 (holding ratification in the pooling context is conclusively established "based 'solely on the facts that [the lessors] received notice of an amendment to the unit designation, accepted royalties from the amended unit, and [did] not challenge the amended unit'") (quoting *Hooks*, 457 S.W.3d at 66) *with Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000) ("Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken.  The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit.") (internal citation omitted).  Because the trial court's order narrows the controlling question of law to the issue of ratification, we do not have jurisdiction to separately address estoppel.

## CONCLUSION

The portion of the trial court's order granting summary judgment in favor of the appellees on the affirmative defense of ratification as it relates to the no pooling clause of the lease is reversed, and the cause is remanded to the trial court for further proceedings.

Sandee Bryan Marion, Chief Justice