**Opinion filed March 12, 2026**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00192-CV

_____

### EVANS RESOURCES, L.P., Appellant

### V.

### PETROPLEX ENERGY, INC.; RYAN C. ANWAR; LESLIE G. ANWAR; AND SYED JAVAID ANWAR, AS INDEPENDENT ADMINISTRATOR FOR THE ESTATE OF TAHIRA KHATOON, Appellees

**On Appeal from the 238th District Court**
**Midland County, Texas**
**Trial Court Cause No. CV60098**

## O P I N I O N

Appellant, Evans Resources, L.P. (Evans), appeals summary judgment granted in favor of Appellees, Petroplex Energy, Inc.; Ryan C. Anwar; Leslie G. Anwar; and Syed Javaid Anwar, as independent administrator for the Estate of

Tahira Khatoon (collectively the Anwars), wherein the trial court ordered that Evans take nothing from the Anwars. Evans challenges the summary judgment in two issues on appeal. In its first issue, Evans asserts that specific terms within the Anwars' joint operating agreement with the operator, Diamondback, required that delinquent royalty payments were to be made to lessors like Evans directly by the Anwars. In its second issue, Evans alternatively contends that it has a claim for money had and received against the Anwars because Diamondback made payments to the Anwars that included amounts belonging to Evans.

We affirm.

## I. *Factual and Procedural History*

### A. *Prior Litigation*

Evans owns a mineral estate in Section 8, Block X, T-1-S, H.P. Hilliard Survey—a 651-acre property in Midland County (the Evans property). We have previously addressed disputes between Evans, including Evans's affiliates, and Diamondback,[1] an oil and gas lessee and operator. *See Evans Res., L.P. v. Diamondback E&P, LLC (Evans II)*, 725 S.W.3d 718 (Tex. App.—Eastland 2025, no pet.); *Evans Res., L.P. v. Diamondback E&P, LLC (Evans I)*, No. 11-18-00128-CV, 2020 WL 2838529 (Tex. App.—Eastland May 29, 2020, pet. denied) (mem. op.). In *Evans I*, Evans sued Diamondback on the theory that Diamondback breached the parties' surface agreement by failing to pay contractual damages for horizontal wellsite locations that Diamondback did *not* drill on the Evans property. 2020 WL 2838529, at *3. The trial court granted summary judgment dismissing the claim, and we affirmed. *Id.* at *3, *8. In *Evans II*, Evans complained in part that Diamondback committed fraud by failing to fulfill an oral promise to drill horizontal

---

[1]The Diamondback entities are Diamondback E&P, LLC and Diamondback O&G, LLC. We refer to both as Diamondback for purposes of this opinion.

wellsite locations on the Evans property, there was an underpayment of royalties, and that Evans was a cotenant and entitled to an accounting of royalties. 725 S.W.3d at 726. We ultimately affirmed the trial court's take-nothing judgment in favor of Diamondback. *See id.* at 749.

B. *Current Suit*

In the present litigation, Evans sought oil and gas royalties allegedly paid by Diamondback to the Anwars for horizontal wellsite locations on cotenancy acreage. On the leases contributed to the joint operating agreement (JOA) by the Anwars, they are the lessee (the Anwars property), and they have separate lease agreements with lessors that are not parties to this litigation.

Evans entered into a 2010 lease on the Evans property with Bluestem, an oil and gas operator ("the Lease" or "Evans lease"); the original lease was amended in 2012 and 2014. Bluestem then assigned the lease to Diamondback in September 2014.

In October 2014, Diamondback entered into the JOA with the Anwars. The JOA between the Anwars and Diamondback was a compendium of multiple Diamondback and Anwar leases contributed for joint operating purposes. Diamondback was the JOA operator. Under the JOA with the Anwars, the Anwars contributed three leases and Diamondback contributed others, including the Evans lease. Diamondback then drilled wells on the Evans lease that included acreage over which the lease had terminated in 2018, by the lease's own terms. Evans claimed that the Lease terminated in November 2018 as to "certain acreage and depths" on the Evans property. Lease termination was apparently disputed by Diamondback initially, but in 2022 Diamondback filed a release of the "certain acreage and depths" in the Lease, effective November 2018. We refer to that expired lease acreage as "cotenancy acreage." The JOA permitted Diamondback to drill the Anwars' and its own contributed leases, including as lessee of Evans's mineral estate. But Evans

3

and the Anwars have no direct contractual relationship, and the JOA contributed Diamondback leases do not overlap with the Anwars' contributed leases.

Pursuant to the JOA, Diamondback retained all revenue generated from the producing wells and Diamondback distributed it to each JOA party in accordance with the JOA's terms. The JOA was later amended to provide for horizontal drilling, with Diamondback serving as the operator for the vertical wells on the Evans property as well as the horizontal wells on the Anwars' property; but with Petroplex serving as the operator for the vertical wells on the Anwars' property. A subsequent amendment listed the various leases covered by the JOA as well as each party's interest in the wells. The Anwars had a working interest in three of the eighty-nine leases in the contract area and owned an approximately 35% interest in production from the horizontal wells. Diamondback owned the remaining 65% production from horizontal wells, which included its lease with Evans.

C. *Royalty Provisions*

Under Article III.B of the JOA, titled "Interests of Parties in Costs and Production," the JOA stated:

> Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may be payable . . . each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of one quarter (1/4).

The article continues:

> [I]f any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of [one quarter], such party so burdened shall assume and alone bear all such excess obligations.

The article contains the following disclaimer:

> Nothing contained in this Article III.B shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned

4

Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

In Article VII.A, titled "Liability of Parties," the JOA provides:

Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area . . . and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder.

A section titled "Unleased Interests" in two amendments to the JOA state:

It is recognized that there are tracts of land, or interests in tracts of land, within the Contract Area that are not committed to this agreement by any party hereto. In such instances the interests of the parties . . . shall be deemed to apply to the aggregate undivided interest in the oil and gas mineral estate included in oil and gas leases or oil and gas interests committed by the parties.

D.    *Evans's Allegations*

In its live pleading, its first amended petition, Evans brought claims against the Anwars for declaratory relief, payment of royalty, accounting of royalty, and accounting for profits for the cotenant wells drilled by Diamondback (also titled "money had and received"). Under its royalty claims, Evans alleged that the Anwars owed a duty to pay received royalties to Evans because the JOA assigned Diamondback's obligation to do so to the Anwars.

Under its cotenant-accounting claim, which Evans characterizes on appeal as solely a money had and received claim, Evans alleged that it was entitled to an accounting and the recovery of earned profits that the Anwars had been paid. Particularly, Evans alleged that the Evans lease expired as to certain acreage and depths, and that Evans then became cotenants with Diamondback as to that acreage. Evans claimed that it never consented to the drilling of wells in the unleased/cotenancy acreage and that Diamondback paid the Anwars money to which Evans was entitled from well production since 2018.

5

## E. *The Anwars' Motion for Summary Judgment*

The Anwars filed a traditional motion for summary judgment, arguing that they do not have privity of contract or estate with Evans pursuant to the JOA, that Evans—not being a party thereto—cannot enforce the JOA's terms, and that the JOA specifically disclaims any assignment of interests. Further, the Anwars claimed that they owe no duty to Evans as a cotenant and they denied receiving any revenue attributable to Evans. The Anwars maintained that they were accurately paid revenue attributable to their 35% interest in horizontal well production. The Anwars supported their motion with the following exhibits: (1) the JOA and amendments; (2) the Evans lease and later assignment to Diamondback; (3) the affidavit of David Donnell, land manager for Petroplex; and (4) the Anwars' leases.

In his affidavit, Donnell testified that the Anwars "have not participated in drilling horizontal wells on the property, other than contributing to the shared costs pursuant to the JOA as non-operators." He further stated that, "None of the proceeds of production from the Evans Lease have been paid to [the Anwars]" and the Anwars "have not received any revenue attributable to [Evans]" but "have only received revenue based on the leases they contributed to the JOA."

Evans filed a response, arguing that: the JOA, to which Evans claimed status as a third-party beneficiary, required the Anwars to "pay their share of royalties and other burdens on production anywhere within the contract area;" and the Anwars received money from the production of the cotenant wells that rightfully belonged to Evans. Evans relied on the same evidence as the Anwars, while also attaching the following additional exhibits: (1) the amended partial release of oil and gas leases; (2) the expert report of Tim Smith; and (3) discovery requests and responses.

Evans complained of the Anwars' failure to reply to certain discovery, but it did not file a motion for continuance or to compel production regarding those complaints. Evans also argued that it is a third-party beneficiary to the JOA, because

the agreement "expresses a clear intent that the parties to the JOA will bear responsibility for royalties in proportion to their interests . . . regardless of whether the royalty is one owed on a lease the party contributed" and that a contrary interpretation would render the JOA "facially ambiguous." Evans argued that its cotenant claim is "in effect, a claim for money had and received" and that the Anwars failed to disprove that they held money that belongs to Evans. Evans explained that its lease with Diamondback terminated "'on the date which is the fifth (5th) anniversary of the date on which the primary term of [the] Lease expires' as to any and all acreage covered by the Lease 'not then located within a Producing Unit,'" which occurred on November 3, 2018. Relying on Smith's expert report, Evans maintained that after the 2018 expiration of lease acreage, Evans and Diamondback became cotenants thereto, after which, "several wells have been drilled traversing acreages and depths" to which Evans "own[ed] a working interest" and was "owed a share of profits." Evans alleged, but cited no evidence, that the Anwars have "received money that belongs to [Evans]."

F.     *Trial Court's Ruling*

The trial court signed a final take-nothing judgment, granting the Anwars' motion for summary judgment. This appeal followed.

## II. *Standard of Review*

We review a trial court's grant of summary judgment de novo. *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 837 (Tex. 2018). To prevail under the traditional summary judgment standard, the movant has the burden to establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c);[2] *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d

---

[2]We note that the supreme court has revised Rule 166a. Although the "rewrite is not intended to substantively change the law," it has resulted in a renumbering of the provisions of the rule. *See* Final Approval of Amendments to Rule 166a of the Texas Rules of Civil Procedure, Misc. Docket No. 26-9012

858, 865 (Tex. 2018).  If the movant meets its summary judgment burden, the burden shifts to the nonmovant to raise a genuine issue of material fact that would preclude the grant of summary judgment.  *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 510–11 (Tex. 2014).

To determine if a genuine issue of material fact exists, we review the evidence in the light most favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor.  *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019).  We credit evidence favorable to the nonmovant if reasonable jurors could do so, and we disregard contrary evidence unless reasonable jurors could not.  *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 774 (Tex. 2017); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).  The evidence raises a genuine issue of material fact if reasonable and fair-minded factfinders could differ in their conclusions in light of all of the summary judgment evidence presented.  *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

The construction of an unambiguous contract is a question of law that we review de novo.  *See Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011); *Anadarko Petrol. Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002).  "[T]he construction of an unambiguous contract, including the determination of whether it is unambiguous, depends on the language of the contract itself, construed in light of the surrounding circumstances."  *First Bank v. Brumitt*, 519 S.W.3d 95, 109 (Tex. 2017); *see Tawes*, 340 S.W.3d at 426 (determining third-party beneficiary status by considering "the oil and gas industry's customary purpose for using [joint operating agreements], and . . . the plain language of the [agreement] at issue here"); *Luling*

---

(Tex. Feb. 27, 2026).  The amendments to this rule only apply to motions for summary judgment filed on or after March 1, 2026.  Because the Anwars' motion for summary judgment in this case was filed prior to that date, we refer to the rule in effect at the time the motion was filed.  *See id.*

*Oil & Gas Co. v. Humble Oil & Ref. Co.*, 191 S.W.2d 716, 724 (Tex. 1946) (holding that oil and gas contract "must be construed in connection with the rules and the customs of the industry to which the contract relates").

"When discerning the contracting parties' intent, courts must examine the entire agreement and give effect to each provision so that none is rendered meaningless." *Tawes,* 340 S.W.3d at 425. "We give contract terms their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning." *Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (quoting *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009)). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Tawes,* 340 S.W.3d at 425 (quoting *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983)).

### III. *Royalty Claims*

In its second issue, which we address first, Evans argues that the trial court erred in granting summary judgment on its royalty claims. Evans asserts that the Anwars, under the JOA, "have an obligation to pay a proportionate share of royalties owed under the Evans Lease." Citing Article III.B of the JOA, Evans maintains that "each party to the JOA, including [the Anwars], expressly assumed the obligation of paying or delivering the royalty associated with the Evans Lease on that party's share of production . . . up to one quarter on its share of production." Evans also maintains that the JOA's disclaimer language "should not be read to fully preclude a partial assignment . . . because such interpretation would conflict with [the earlier provision] which partially assigns an interest in the Evans lease to [the Anwars.]" Evans argues in the alternative that the JOA is ambiguous or that Evans is a third-party beneficiary "[b]ecause the JOA reflects a clear intent that [the Anwars] are responsible for paying a proportionate share of [Evans's] royalties."

Relying largely on *Tawes*, the Anwars respond that the unambiguous JOA creates no duty for the Anwars to pay Evans royalties either "via privity of contract, privity of estate, or status as a third-party beneficiary." *See Tawes*, 340 S.W.3d at 425–31.

A. *Applicable Law*

JOAs are contracts commonplace in the oil and gas industry, and their "function is to designate an 'operator, describe the scope of the operator's authority, provide for the allocation of costs and production among the parties to the agreement, and provide for recourse among the parties if one or more default in their obligations.'" *Id.* at 426 (quoting *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 344 n.1 (Tex. 2006)). "JOAs govern operations involving great financial risk and are therefore utilized for the purpose of shielding non-operators, . . . 'from liability for all costs or other obligations incurred in conducting the operations.'" *Id.* (quoting 3 Ernest E. Smith & Jacqueline Lang Weaver, *Texas Law of Oil and Gas* § 17. 1, at 377 (1996 ed.)). Liability to a lessor for payment of royalties can arise from privity of contract or, where there has been a full assignment of the lease, privity of estate. *Tawes*, 340 S.W.3d at 429 (citing *Amco Tr., Inc. v. Naylor*, 317 S.W.2d 47, 50 (Tex. 1958)).

"Privity of estate arises between an assignee of a lessee's entire interest in a lease and the original lessor." *Id.* (citing *Naylor*, 317 S.W.2d at 50). "An assignment creating privity of estate occurs when a lessee executes an instrument conveying his entire estate and interest under a lease to a subsequent lessee so that the original lessee retains no reversionary interest in the lease whatsoever." *Id.* (citing *Westland Oil Dev. Corp. v. Gulf Oil Corp.,* 637 S.W.2d 903, 905, 910–11 (Tex. 1982) (Privity of estate existed between two parties because of their "area of mutual interest agreement," which was "in the nature of a contract to convey interests in oil and gas leases.")).

> The payment of royalties on production to a lessor is a covenant running with lands covered by an oil and gas lease. Therefore, when privity of estate exists between an assignee of an oil and gas lessee's entire leasehold interest and the original oil and gas lessor, the assignee must pay the lessor's royalties as required by the oil and gas lease.

*Id.* (internal citations omitted).

"Privity of contract, as a necessary predicate to suit on a contract, has a long and settled history in this State." *Interstate Contracting Corp. v. City of Dallas*, 135 S.W.3d 605, 607 (Tex. 2004). "Privity is an essential element for recovery in any action based on contract; a breach of contract action normally requires privity between the injured party and the party sought to be held liable." *Sanders v. Total Heat & Air, Inc.*, 248 S.W.3d 907, 912 (Tex. App.—Dallas 2008, no pet.). Naturally, a non-signatory to a contract does not have privity of contract with the contract's signatories. *See Tawes*, 340 S.W.3d at 430. "Where a theory of recovery based on third-party beneficiary status fails, so too must a privity of contract theory, no matter how artfully constructed." *Id.* at 430–31 (citing 9 Arthur Linton Corbin, *Corbin on Contracts* § 47.6, at 142 (2007 ed.)).

"A third party may enforce a contract it did not sign when the parties to the contract entered the agreement with the clear and express intention of directly benefitting the third party." *Id.* at 425 (citing *MCI Telecomms. Corp. v. Tex. Util. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999)). "When the contract confers only an indirect, incidental benefit, a third party cannot enforce the contract." *Id.* (citing *MCI*, 995 S.W.2d at 651). "Traditionally, Texas courts have maintained a presumption against third-party beneficiary agreements." *Id.* (first citing *Corpus Christi Bank & Trust v. Smith*, 525 S.W.2d 501, 503–04 (Tex. 1975); and then citing *Standard Accident Ins. Co. v. Knox*, 184 S.W.2d 612, 615 (1945)). "Therefore, in the absence of a clear and unequivocal expression of the contracting parties' intent

11

to directly benefit a third party, courts will not confer third-party beneficiary status by implication." *Id.* (citing *MCI*, 995 S.W.2d at 651).

B. *Analysis*

Our analysis is largely controlled by *Tawes*. In that case, the Texas Supreme Court addressed "an oil and gas lessor's claim for unpaid royalties" by considering "the construction and application of a Working Interest Unit Agreement (WIUA) and a [JOA]." *Id.* at 421. The Fifth Circuit certified, in relevant part, the following question for the Texas Supreme Court: "whether the lessor here, either as a third-party beneficiary or through privity of estate, can enforce the WIUA and JOA to recover unpaid royalties from an investor who consented to the drilling of two wells on a pooled gas unit, but did not operate the wells." *Id.* The court ultimately held that a royalty owner whose lessee is a party to a JOA is not a third-party beneficiary and does not have privity of estate with other working interest owners under a provision of the agreement allocating royalty responsibility. *See id.* at 425–31.

In *Tawes*, Article VI.B.2 in the JOA "required the consenting parties to pay the royalties which would have been owed to the lessors of leases contributed . . . by the non-consenting parties had they consented to the additional operations from the beginning." *Id.* at 423. In concluding that the agreements at issue did not create a third-party beneficiary status, the court explained, "We deduce from the oil and gas industry's customary purpose for using JOAs, and from the plain language of the JOA at issue here, that neither [party to the JOA] included the JOA Royalty Provision with the intention of directly benefitting any lessor of [the contributed] lease." *Id.* at 426. Rather, the plain language of the agreements "ma[de] clear that [the contributor of the lease] was ultimately responsible for paying its lessor . . . the royalties from production owed to her pursuant to the terms of the [lease]." *Id.* In looking to other cost-sharing provisions of the parties' agreements, the court concluded, "The [agreements] demonstrate that the clear intent of the signatories

thereto was to allocate responsibilities for the payment of operating expenses for the specific purpose of maintaining each [lease], not to directly benefit [the non-signatory lessor.]" *Id.* at 427. Ultimately, the court stated that "the controlling factor is the absence of any sufficiently clear and unequivocal language demonstrating an intent to directly benefit Barnes or any other would-be beneficiary of the contract." *Id.* at 428.

In analyzing whether the parties had privity of estate in *Tawes*, the court noted that the JOA provided: "Nothing contained in this [contract] shall be deemed an assignment or cross-assignment of interest covered hereby." *Id.* at 429. The court also noted that "the period of time during which the JOA grants consenting parties temporary ownership of non-consenting parties' share of production . . . is limited." *Id.* at 430. The court concluded that "because [the consenting party] received no permanent interest in the [non-consenting party's lease], privity of estate [did] not exist between [them]." *Id.*

The JOA terms in the present case, while not identical to *Tawes*, are largely similar. As we described above, Article III.B allocates royalty responsibilities between Diamondback and the Anwars, the JOA's signatories:

> Regardless of which party has contributed an oil and gas lease or Oil and Gas Interest on which royalty or other burdens may be payable . . . each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of one quarter (1/4). . . .
>
> [I]f any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of [one quarter], such party so burdened shall assume and alone bear all such excess obligations.

And the article contains the following assignment disclaimer:

> Nothing contained in this Article III.B shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned

13

Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interest for the purposes of this agreement.

Evans maintains that the language is distinguishable from the agreements in *Tawes* because "when the burden is not in excess of one quarter, each party is responsible for lease burdens on production from the Contract Area regardless of whether the royalty is one owed on a lease the party contributed." But as the supreme court observed in *Tawes*, an assumption of a contractual obligation to pay royalties does not equate to the assignment of a lessee's interest and that assumption does not create privity of contract, *see id.* at 430 (noting "that a sublessee who agreed to pay a certain amount of rent on a certain date but did not obligate himself to pay that amount to the lessor directly, did not assume liability for the lessor's unpaid rents"), or privity of estate, *see id.* ("What Barnes appears to describe as a new theory of privity by assumption, we rather see as a convoluted restatement of privity of contract.").

Recognizing that JOAs are not used for the purpose of "transfer[ring] ownership interests in pooled oil and gas leases," that the Anwars received no permanent interest in the Evans lease, and that this particular JOA contains an express disclaimer of such a purpose, we conclude that Evans does not have privity of estate with the Anwars such that it can enforce the JOA's royalty provisions. *See id.* at 429–30.

Regarding whether Evans is a third-party beneficiary to the JOA, we note that, unlike the JOA in *Tawes*, this JOA *expressly* disclaims third-party liability. Further, as in *Tawes*, "the controlling factor is the absence of any sufficiently clear and unequivocal language demonstrating an intent to directly benefit" Evans. *Id.* at 428. We conclude that the plain language of the JOA is unambiguous and makes clear that Diamondback, as the contributor of the Evans lease, was ultimately responsible for paying its lessor, Evans, the royalties from production owed to it pursuant to the lease. *See id.* at 426. Because the Anwars did not permanently acquire Evans's

14

interest in the horizontal wells, and because the Anwars did not otherwise contractually assume a duty to pay royalties accruing on production from the wells directly to Evans, we hold that the parties do not share any privity which allows Evans to enforce the JOA. *See id.* at 431.

Absent privity of contract, privity of estate, or third-party beneficiary status, Evans cannot enforce the JOA. *See id.* Accordingly, the trial court did not err in granting summary judgment on Evans's royalty claims. *See Rodriguez*, 547 S.W.3d at 837. We overrule Evans's second issue.

## IV. *Money Had and Received Claim*

We now address Evans's first issue, wherein it argues that the trial court erred in granting summary judgment on its claim for money had and received.[3] Evans asserts that this claim does not rely on any duties created by the JOA and the Anwars "did not submit any evidence that [the Anwars] did not receive any money belonging to [Evans]." Specifically, Evans argues that the Anwars were required to present evidence either showing what shares of gross production the Anwars received or whether the Anwars received any shares belonging to Evans "because as an unleased fee mineral owner, the percentage of proceeds . . . [Evans] was entitled to may have exceeded the proportional share agreed upon by Diamondback and [the Anwars]."

The Anwars respond that, in essence, Evans is claiming: "that due to Diamondback's production of [Evans's] minerals, the Anwars hold money that in equity belongs to [Evans]." The Anwars maintain that this premise "is false as a matter of both law and fact." The Anwars explain that "there is no cotenancy relationship between the parties that would create a duty for [them] to account or to pay profits from their percentage of production to [Evans]." And, relying on Donnell's testimony and the JOA, the Anwars state that "[t]he uncontroverted

---

[3]Evans does not challenge the trial court's take-nothing judgment on its "cotenant accounting" claim but maintains it is a money had and received claim.

15

summary judgment evidence shows that the Anwars received no profits or production attributable to [Evans]."

In its reply brief, Evans asserts that the Anwars improperly relied on a statement in the Donnell affidavit as evidence that they did not receive money owed to Evans. Evans argues that the statement is conclusory and not competent summary judgment evidence "because it does not provide the underlying facts to support Donnell's conclusion" and "because it does not move beyond a simple denial of [Evans's] claim."

A. *Applicable Law*

"Owners of undivided portions of oil and gas rights in and under real estate are tenants in common, and an oil and gas lessee of a co-tenant becomes a co-tenant with the co-tenants of his lessor." *Radcliffe v. Tidal Petroleum, Inc.*, 521 S.W.3d 375, 383 (Tex. App.—San Antonio 2017, pet. denied) (quoting *Willson v. Superior Oil Co.*, 274 S.W.2d 947, 950 (Tex. App.—Texarkana 1954, writ ref'd n.r.e.)). "Absent an agreement, the common law permits a mineral co-tenant to extract oil and gas but requires a producing co-tenant to account to the nonconsenting or nonproducing co-tenant for its pro rata share of production, net of necessary and reasonable expenses incurred in producing and marketing the same." *In re Eagleridge Operating, LLC*, 642 S.W.3d 518, 521 (Tex. 2022) (orig. proceeding); *see Cox v. Davison*, 397 S.W.2d 200, 203 (Tex. 1965) ("As between the producing cotenant and the non-joining cotenant a balance of equities has been struck. The rule of accountability is the proportionate market value of the product less the proportionate necessary and reasonable costs of producing and marketing.").

"A cause of action for money had and received is not based on wrongdoing, but, instead, looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another." *Boothe v. Green*, 534 S.W.3d 93, 96 (Tex. App.—Corpus Christi–Edinburg 2017, pet. denied) (quoting

16

*Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 860 (Tex. App.—Fort Worth 2005, no pet.)). The claim has two elements: (1) the defendant holds money, (2) which in equity and good conscience belongs to the plaintiff. *Norhill Energy LLC v. McDaniel*, 517 S.W.3d 910, 917–18 (Tex. App.—Fort Worth 2017, pet. denied) (citing *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 302 n.4 (Tex. 2015)).

A "conclusory" statement is defined as "[e]xpressing a factual inference without stating the underlying facts on which the inference is based." *See Arkoma Basin Expl. Co. v. FMF Assocs. 1990–A, Ltd.*, 249 S.W.3d 380, 389 n.32 (Tex. 2008) (citing BLACK'S LAW DICTIONARY 308 (8th ed. 2004)). Conclusory affidavits are not sufficient to raise fact issues because they are not credible or susceptible to being readily controverted. *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996) (per curiam). "'Could have been readily controverted' does not mean that the summary judgment evidence could have been easily and conveniently rebutted, but rather indicates that the testimony could have been effectively countered by opposing evidence." *Trico Techs. Corp. v. Montiel*, 949 S.W.2d 308, 310 (Tex. 1997) (quoting *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex, 1989)). In evaluating whether Donnell's statements are conclusory, we must be mindful that showing nonreceipt of royalties owed to Evans requires the Anwars to prove a negative, but "[a]s the supreme court has observed, proving a negative is inherently difficult and this fact should be taken into account in evaluating the quantum of proof necessary to do so." *Harris Cent. Appraisal Dist. v. Houston Pipe Line Co LP*, 706 S.W.3d 568, 578 (Tex. App.—Houston [1st Dist.] 2024, no pet.) (citing *State Farm Mut. Auto. Ins. Co. v. Matlock*, 462 S.W.2d 277, 278 (Tex. 1970)).

B. *Analysis*

Though Evans seeks royalties that Diamondback allegedly paid to the Anwars pursuant to the JOA for horizontal wells, claiming that those royalties should have

17

been paid by Diamondback to Evans, as noted above, the Anwars' and Evans's interests are in separate tracts of land. Accordingly, no duty exists for the Anwars to pay any share of production to Evans due to a cotenancy relationship. *See Radcliffe*, 521 S.W.3d at 383. Attempting to rebut this reality, Evans argues that its claim is for "money had and received" and that "duty" is not an element of that claim.

In their motion for summary judgment, faced with a claim by Evans that, in the absence of a legal duty to account as a cotenant, the Anwars might nevertheless have been paid money to which Evans was entitled, the Anwars rely on both the language of the JOA and David Donnell's testimony[4] to establish that they did not receive such payments. As noted by the Anwars, the JOA provides for the distribution of "joint-development revenue in proportion to the allocated interests agreed to by the JOA parties" and "[n]one of the Anwars' contributed acreage [is] co-owned by [Evans]." Donnell, in explaining the distribution of funds under the JOA, testified as follows:

> [Evans] is the lessor for a different oil and gas lease subject to the JOA, the Evans Lease. [Diamondback] is the lessee for the Evans Lease and contributed that lease to the JOA. [The Anwars] did not contribute the Evans Lease to the JOA. They are not lessees for the Evans Lease. Diamondback did not convey any interest in the Evans Lease to [the Anwars]. None of [the Anwars] have ever been assigned the Evans Lease in whole or in part.

> [The Anwars] are not producing cotenants for the contract area. [Diamondback] is the designated operator under the JOA. Pursuant to that role, Diamondback has drilled horizontal wells on the contract area and distributed proceeds from production. Thus, Diamondback is the

---

[4]As to his qualifications, Donnell testified in his affidavit: "I am currently Land Manager for Petroplex Energy, Inc. I have worked at Petroplex since 2012. In my capacity as Land Manager, I am knowledgeable about the Joint Operating Agreement dated October 1, 2014 ("JOA") and its subsequent amendments in 2017 and 2022. I also have personal knowledge regarding the relationships and roles of the signatories to the Joint Operating Agreements, related operations on the contract area, and the management of the oil and gas leases governed by the JOA."

producing cotenant. [The Anwars] have not participated in drilling horizontal wells on the property, other than contributing to the shared costs pursuant to the JOA as non-operators.

As part of its role as operator, all revenue from wells producing in the contract area goes to Diamondback, who then disperses revenue based on the various interests determined by each contributed lease. None of the proceeds of production from the Evans Lease have been paid to [the Anwars]. [The Anwars] have not received any revenue attributable to [Evans. The Anwars] have only received revenue based on the leases they contributed to the JOA.

Contrary to Evans's assertion, these statements are not conclusory because they are based on underlying facts—the terms of the JOA and Donnell's personal knowledge of the drilling operations. *See Arkoma Basin*, 249 S.W.3d at 389 n.32. And Donnell's statements can be readily controverted because they can be countered by opposing evidence. *See Montiel*, 949 S.W.2d at 310. Evans readily admits this point in its brief: "The summary judgment record contains leases and agreements between the various parties, but it *does not contain* any evidence relating to actual production, proceeds, amount of money, or gross share of production [the Anwars] received." Evans had equal access to this missing evidence through discovery[5] such that it could have included it in its response to the Anwars' motion, yet it did move to compel its production or to continue the summary judgment hearing. *See* TEX. R. CIV. P. 166a(g); *Rodriguez v. Acad., Ltd.*, 694 S.W.3d 780, 784 (Tex. App.—Houston [14th Dist.] 2024, pet. denied) ("When a party contends that it has not had an adequate opportunity for discovery before a summary-judgment hearing, it must file either an affidavit explaining the need for further discovery or a verified motion for continuance.").

---

[5]Why further discovery was not pursued through subpoena duces tecum and/or deposition of the JOA operator, Diamondback, or of Petroplex is not explained by Evans.

Acknowledging the difficulty in proving a negative, we conclude that the Anwars presented sufficient evidence to establish as a matter of law that they did not hold money which belongs to Evans, and, in its response, Evans produced no evidence raising a genuine issue of material fact in this regard. *See Koopmann*, 547 S.W.3d at 865; *Amedisys*, 437 S.W.3d at 510–11; *Harris*, 706 S.W.3d at 578; *Norhill*, 517 S.W.3d at 917–18. Accordingly, the trial court did not err in granting summary judgment on Evans's claim for money had and received. *See Rodriguez*, 547 S.W.3d at 837. We overrule Evans's first issue.

## V. *This Court's Ruling*

We affirm the trial court's judgment.

W. BRUCE WILLIAMS
JUSTICE

March 12, 2026

Panel consists of: Bailey, C.J., and Williams, J.
Trotter, J., not participating.[6]

---

[6]At the time of submission on oral argument, Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sat on the panel by assignment. Unfortunately, he passed away before issuance of this opinion.